STATE OF CONNECTICUT *v.* CARLOS DEJESUS
(AC 25589)

Lavery, C. J., and Schaller and Peters, Js.

48

Argued March 22—officially released August 30, 2005

*Darcy McGraw*, special public defender, for the appellant (defendant).

*Marjorie Allen Dauster*, senior assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Vicki Melchiorre*, senior assistant state's attorney, for the appellee (state).

*Opinion*

SCHALLER, J. The defendant, Carlos DeJesus, appeals from the judgment of conviction, rendered after a jury trial, of two counts of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1) and two counts of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A). On appeal, the defendant claims that the trial court improperly (1) admitted uncharged misconduct evidence, (2) denied him due process of law, (3) refused to conduct an in camera review of the victim's medical records and (4) refused to suppress the defendant's statements made during a police interview. The defendant further claims that § 53a-92 (a) (2) (A) is unconstitutionally vague as applied to the facts supporting his conviction of kidnapping in the first degree. We agree with the defendant with respect to his last claim and, accordingly, reverse the conviction of kidnapping in the first degree as charged in count four of the information. We

affirm the judgment of the trial court in all other respects.

The jury reasonably could have found the following facts. At all pertinent times, the defendant was employed by a supermarket chain as a customer service manager. As part of his employment duties, the defendant was responsible for hiring individuals to work at the store. In August, 2000, he hired the nineteen year old victim,[1] and she eventually assumed the duties of a bagger. She had attended special education classes while in high school and had difficulty learning new tasks. Other witnesses, including the victim's father and a police officer, also testified that the victim had limited mental abilities. The victim's immediate supervisor was someone other than the defendant, but the defendant often managed the entire store and was aware of the victim's special needs.

The defendant sexually assaulted the victim on two separate occasions in 2000. The first assault occurred when the defendant instructed the victim to go to the payroll room, which is located in the upper level of the store, to sit in a chair, to close her eyes and to open her mouth. The defendant then ordered the victim to "suck [on] his finger." After she had done so, the defendant forced her to perform oral sex on him.

The second sexual assault committed by the defendant on the victim also occurred in the upper level of the store. After telling the victim to go to a room near his office, the defendant entered and proceeded to remove the victim's pants and underwear and had her sit on a desk. The victim told the defendant that she did not want to do that, but he ignored her protests and remained silent. The defendant penetrated the victim's

---

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

vagina with his penis, causing her a great deal of discomfort. She was able to move away from him, replace her clothes and leave the room. The defendant did not say anything but looked angry as she left.[2]

The victim subsequently ended her employment at the supermarket but continued to shop at that particular location with her family. At some point in 2001, the defendant approached the victim and her father while they were shopping. In speaking with her father, the defendant indicated that the victim had been a "good worker" and that he wanted her to resume her employment at the supermarket. The victim's father, who at that time was unaware that the defendant had sexually abused his daughter, encouraged her to return to work. She agreed and was required to attend an orientation session prior to resuming her employment.

Toward the end of June, 2001, the victim spoke with the defendant at the supermarket. He again instructed her to wait in an empty room located in the store's upper level. The defendant entered the room and kissed the victim on the mouth. He instructed her to sit on a chair and reached inside of her shirt, placing his hand on her stomach. He proceeded to remove her pants and underwear, locked his hands behind her head, straddled the chair she was sitting on and forced her to perform oral sex on him. That lasted for a few minutes, after which the defendant penetrated her vagina with his finger.

The victim reported this incident to the police department, which commenced an investigation. The defendant, in an interview at the police station, initially

---

[2] Counts three and four of the information charged the defendant with sexual assault and kidnapping stemming from his conduct that occurred in 2000. The court instructed the jury that it could convict the defendant on the basis of either incident but that it was required to agree unanimously on the same incident.

denied having any sexual contact with the victim but then recanted and stated that any sexual activity between them was consensual. The defendant subsequently was charged, tried and convicted on all counts. The court sentenced the defendant to an effective term of incarceration of twenty years, suspended after sixteen, and ten years special probation. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the court improperly admitted uncharged misconduct evidence. Specifically, the defendant argues that the uncharged misconduct evidence was admitted improperly to prove intent, that the uncharged misconduct was insufficient to demonstrate a common plan or scheme, that the court failed to issue a limiting instruction concerning the evidence of uncharged misconduct, despite having stated that it would do so, and that the prejudicial impact of the uncharged misconduct evidence outweighed its probative value. We disagree with all of the defendant's arguments.

The following additional facts are necessary for our resolution of the defendant's claim. The state sought to introduce into evidence the testimony of N, a young woman who had worked at the same store as the victim and who alleged that she also had been sexually assaulted by the defendant. The state proffered N's testimony on the issues of intent and a common scheme or plan. The defendant objected on the grounds that the testimony was not relevant and that its probative value did not outweigh its prejudicial impact.

The court held a hearing outside of the presence of the jury during which N testified and was cross-examined by defense counsel. At the conclusion of her testimony and after listening to argument by counsel, the court ruled that it would permit N to testify before

the jury. The court stated that it would give a limiting instruction at the conclusion of N's testimony and during the charge to the jury.

N then testified before the jury. She had been hired by the defendant in February, 2000, as a cashier and bagger. N attended special education classes as a result of her learning disability and told the defendant that she was concerned about working in a crowded store. According to N, the defendant paid "a lot of attention" to her. The excessive attention made N feel uncomfortable.

In April, 2000, the defendant was on the upper level of the store, and N asked him to get her a new name tag and shirt after her shift had concluded. The defendant signaled her to follow him into a dark room, and, after she arrived, he proceeded to kiss and to touch her. He then grabbed her by the arms, turned her around and pressed his penis into her. The defendant restrained N so that she could not move while he rubbed against her. At some point, the defendant stopped and N turned around. She observed the defendant masturbating and declined his invitation to touch his penis. She recalled that the entire episode, from the time she entered the dark room until the defendant left, took approximately ten minutes.[3] Following N's testimony, the court gave the jury a limiting instruction.

As a preliminary matter, we identify the relevant legal principles and appropriate standard of review that guide our resolution of the defendant's claim. We then address each of the defendant's specific arguments in turn.

"As a general rule, evidence of prior misconduct is inadmissible to prove that a criminal defendant is guilty

[3] Following sentencing on the charges pertaining to the offenses against the victim, the defendant pleaded guilty to sexual assault in the third degree in violation of General Statutes § 53a-72a as a result of his behavior with N. The court sentenced him to one year of incarceration to run concurrently with his previous sentence.

of the crime of which the defendant is accused. . . . Such evidence cannot be used to suggest that the defendant has a bad character or a propensity for criminal behavior." (Citations omitted.) *State* v. *Kulmac*, 230 Conn. 43, 60, 644 A.2d 887 (1994); see also *State* v. *George B.*, 258 Conn. 779, 790, 785 A.2d 573 (2001); see generally Conn. Code Evid. § 4-5 (a). "The rationale of this rule is to guard against its use merely to show an evil disposition of an accused, and especially the predisposition to commit the crime with which he is now charged." (Internal quotation marks omitted.) *State* v. *O'Neil*, 261 Conn. 49, 80, 801 A.2d 730 (2002).

"Evidence of prior misconduct may be admitted, however, when the evidence is offered for a purpose other than to prove the defendant's bad character or criminal tendencies. . . . Exceptions to the general rule precluding the use of prior misconduct evidence have been recognized in cases in which the evidence is offered to prove, among other things, *intent*, identity, motive, malice or *a common plan or scheme.*" (Emphasis added; internal quotation marks omitted.) *State* v. *Izzo*, 82 Conn. App. 285, 292, 843 A.2d 661, cert. denied, 270 Conn. 902, 853 A.2d 521 (2004); see also Conn. Code Evid. § 4-5 (b); C. Tait, Connecticut Evidence (3d Ed. 2001) § 4.19.2, pp. 232–33.

Our Supreme Court has established a two part test to determine if prior uncharged misconduct should be admitted into evidence. "First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of such evidence must outweigh the prejudicial effect of the other crime evidence. . . . Because of the difficulties inherent in this balancing process, the trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done. . . . On review by this court, therefore, every reasonable presumption should

be given in favor of the trial court's ruling." (Citation omitted; internal quotation marks omitted.) *State* v. *Nunes*, 260 Conn. 649, 685, 800 A.2d 1160 (2002); see also *State* v. *Aaron L.*, 272 Conn. 798, 820, 865 A.2d 1135 (2005); *State* v. *Kulmac*, supra, 230 Conn. 61.

"The first prong of the test requires the trial court to determine if an exception applies to the evidence sought to be admitted." (Internal quotation marks omitted.) *State* v. *Merriam*, 264 Conn. 617, 661, 835 A.2d 895 (2003). It is well established that "[r]elevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . Evidence is relevant if it tends to support the conclusion [for which it is offered], even to a slight degree." (Citation omitted; internal quotation marks omitted.) *State* v. *Graham*, 33 Conn. App. 432, 440, 636 A.2d 852, cert. denied, 229 Conn. 906, 640 A.2d 117 (1994).

In the present case, the court permitted the state to introduce evidence of the defendant's alleged sexual assault of N as evidence establishing the defendant's intent with respect to the alleged sexual assault of the victim, as well as evidence establishing a common scheme or plan. The defendant claims that the court abused its discretion in allowing the admission of the evidence under either exception.

A

The defendant first argues that the court improperly admitted the uncharged misconduct with respect to the issue of intent. Specifically, he contends that the uncharged conduct was irrelevant to whether his sexual conduct with the victim was the result of force rather than a consensual act. We disagree.

General Statutes § 53a-70 (a) provides in relevant part that "[a] person is guilty of sexual assault in the first degree when such person (1) compels another person

to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person . . . ." The appellate courts of this state have indicated that sexual assault in the first degree is a general intent crime. See *State* v. *Pierson*, 201 Conn. 211, 215, 514 A.2d 724 (1986), on appeal after remand, 208 Conn. 683, 546 A.2d 268 (1988), cert. denied, 489 U.S. 1016, 109 S. Ct. 1131, 103 L. Ed. 2d 193 (1989); *State* v. *Rothenberg*, 195 Conn. 253, 258 n.4, 487 A.2d 545 (1985); *State* v. *Jackson*, 30 Conn. App. 281, 290, 620 A.2d 168, cert. denied, 225 Conn. 916, 623 A.2d 1026 (1993). "General intent is the term used to define the requisite mens rea for a crime that has no stated mens rea; the term refers to whether a defendant intended deliberate, conscious or purposeful action, as opposed to causing a prohibited result through accident, mistake, carelessness, or absent-mindedness. Where a particular crime requires only a showing of general intent, the prosecution need not establish that the accused intended the precise harm or precise result which resulted from his acts." (Internal quotation marks omitted.) *State* v. *Browne*, 84 Conn. App. 351, 372, 854 A.2d 13, cert. denied, 271 Conn. 931, 859 A.2d 930 (2004). Succinctly put, the state was required to prove, beyond a reasonable doubt, that the defendant intended, by the use of force, to compel the victim to engage in sexual intercourse. The state also had to carry the burden of proving the lack of consent beyond a reasonable doubt. See *State* v. *Smith*, 210 Conn. 132, 140, 554 A.2d 713 (1989).

"Evidence of other misconduct . . . may be allowed for the purpose of proving many different things, such as intent . . . . Because intent is almost always proved, if at all, by circumstantial evidence, prior mis-

conduct evidence, where available, is often relied upon. . . . When a trial court determines whether it will allow such evidence, it needs to examine the similarities between the prior conduct and the current crime." (Citations omitted; internal quotation marks omitted.) *State* v. *Abrahante*, 56 Conn. App. 65, 77–78, 741 A.2d 976 (1999).

In the present case, the court conducted the requisite analysis of the similarities between the uncharged and charged misconduct. In reviewing the actions of the court, we note that the assaults perpetrated by the defendant shared striking similarities with respect to the personal characteristics of the victim and N, as well as the manner in which the assaults were perpetrated. See *State* v. *Johnson*, 76 Conn. App. 410, 418, 819 A.2d 871, cert. denied, 264 Conn. 912, 826 A.2d 1156 (2003). Both the victim and N were nineteen years old, were similar in physical appearance and had been hired by the defendant, who knew of their intellectual and educational challenges. The defendant, having hired both women, knew of their difficulties and vulnerable nature. We also note that the defendant perpetrated his assaults on both women in a similar manner, namely, by luring them into a small, isolated room in the upper level of the supermarket under false pretenses. Additionally, the assaults all occurred on days that the victims were present at the store for duties related to their employment. Finally, the assaults all occurred approximately within a one year time frame. We note that because the uncharged misconduct was not admitted on the issue of identity, the similarities between the assaults of the victim and N need not constitute a "signature." See *State* v. *Mooney*, 218 Conn. 85, 131–32, 588 A.2d 145, cert. denied, 502 U.S. 919, 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991); see also *State* v. *James G.*, 268 Conn. 382, 394 n.14, 844 A.2d 810 (2004).

We conclude that the court did not abuse its discretion by determining, on the basis of the numerous and significant similarities between the assaults of the two women, that the evidence concerning the defendant's misconduct toward N was relevant to the issue of intent with respect to the charged misconduct. N's testimony was useful to the jury in determining whether the defendant had compelled the victim to engage in sexual conduct with him rather than engage in consensual sexual activities. Moreover, the prior sexual misconduct was sufficiently similar to the sexual misconduct at issue in the present case. See *State* v. *Raynor*, 84 Conn. App. 749, 756–58, 854 A.2d 1133, cert. denied, 271 Conn. 935, 861 A.2d 511 (2004); *State* v. *Abrahante*, supra, 56 Conn. App. 78; *State* v. *Wild*, 43 Conn. App. 458, 464, 684 A.2d 720, cert. denied, 239 Conn. 954, 688 A.2d 326 (1996). The defendant's claim with respect to this issue, therefore, must fail.

B

The defendant next argues that the uncharged misconduct was insufficient to demonstrate a common plan or scheme. The defendant specifically argues that the assault of N was not sufficiently similar to the assault of the victim to warrant the admission of the uncharged misconduct evidence.[4] We are not persuaded.

---

[4] The defendant also argued in his brief that there was no evidence to indicate that the assaults on the victim and N were related as part of some "true plan" and that both assaults were inspired by the same goal or purpose. In arguing that the facts of this case support a finding only of a "spurious plan" rather than the required "true plan" for such evidence to be admitted, the defendant relies on certain dissenting opinions from our Supreme Court. See *State* v. *Merriam*, supra, 264 Conn. 681–82 (*Katz*, *J.*, dissenting); *State* v. *Kulmac*, supra, 230 Conn. 81–86 (*Katz*, *J.*, dissenting). As an intermediate appellate court, however, we cannot adopt the reasoning set forth in a dissenting opinion from our Supreme Court. We are, of course, bound by the majority opinion from that court. As our Supreme Court has not adopted the distinction in sexual assault cases between a "true plan" and a "spurious plan," we need not address that argument.

"When evidence of other crimes is offered to show a common design, the marks which the . . . charged [and uncharged] offenses have in common must be such that it may be logically inferred that if the defendant is guilty of one he must be guilty of the other. . . . It is not enough that the two offenses are similar. To establish a common design, the characteristics of the two offenses must be sufficiently distinctive and unique as to be like a signature. . . . On the other hand, the inference need not depend upon one or more unique features common [to both offenses], for features of substantial but lesser distinctiveness, although insufficient to raise the inference if considered separately, may yield a distinctive combination if considered together. . . . In order to assess the defendant's claim, we must examine the other crimes evidence and compare it to the charged offense.

"To guide this analysis, we have held that [e]vidence of prior sex offenses committed with persons other than the prosecuting witness is admissible to show a common design or plan where the prior offenses (1) are not too remote in time; (2) are similar to the offense charged; and (3) are committed upon persons similar to the prosecuting witness." (Citations omitted; internal quotation marks omitted.) *State* v. *George B.*, supra, 258 Conn. 791–92; see also *State* v. *Merriam*, supra, 264 Conn. 661–62; *State* v. *Kulmac*, supra, 230 Conn. 61–62; *State* v. *Hauck*, 172 Conn. 140, 145, 374 A.2d 150 (1976).

We also note that in cases concerning sexual offenses, courts have exercised greater liberty in allowing evidence of other criminal acts that are demonstrative of a common scheme, pattern or design. See *State* v. *Ellis*, 270 Conn. 337, 355, 852 A.2d 676 (2004); see also *State* v. *Aaron L.*, supra, 272 Conn. 804–805; *State* v. *Kulmac*, supra, 230 Conn. 60; *State* v. *Hauck*, supra, 172 Conn. 145; *State* v. *Gibson*, 75 Conn. App.

103, 111, 815 A.2d 172 (2003), rev'd in part on other grounds, 270 Conn. 55, 850 A.2d 1040 (2004).[5] Furthermore, such evidence is probative to negate a defense of consent. *State* v. *Esposito*, 192 Conn. 166, 173, 471 A.2d 949 (1984). We now turn to the specifics of the present case.

The defendant does not claim that the evidence does not meet the first prong of the test, that is, remoteness in time.[6] Such a challenge could not succeed. All of the assaults in the present case occurred in 2000 and 2001. That time frame is similar to the one at issue in *State* v. *Merriam*, supra, 264 Conn. 662, in which our Supreme Court held that the trial court did not abuse its discretion in admitting the evidence. Id., 664. Furthermore, in *State* v. *Kulmac*, supra, 230 Conn. 62, the court concluded that the prior misconduct evidence properly was admitted despite a seven year span of time between the occurrences.

We also conclude that the similarities between the assault on the victim and the assault on N were sufficient to warrant the introduction into evidence of the uncharged misconduct. The women were similar in age and appearance. Both suffered from a mental disability and had a difficult time learning new skills. The defendant had hired both the victim and N and was aware

---

[5] The defendant's brief was written at a time when his appeal was pending before our Supreme Court. He argued that our Supreme Court should reconsider its decisions on the use of uncharged misconduct evidence in sexual assault cases. Specifically, he requested that our Supreme Court abandon the rule of greater liberality in admitting evidence of uncharged misconduct in cases involving sex related crimes. The defendant's appeal subsequently was transferred to this court. See Practice Book § 65-1. As an intermediate appellate court, we cannot reconsider and revise precedent set by our Supreme Court. *State* v. *Goodman*, 35 Conn. App. 438, 442, 646 A.2d 879, cert. denied, 231 Conn. 940, 653 A.2d 824 (1994). Accordingly, we need not address that claim.

[6] In *State* v. *Madore*, 45 Conn. App. 512, 521, 696 A.2d 1293 (1997), we noted that "[t]emporal remoteness of a prior incident is rarely, standing alone, determinative of the admissibility of such evidence."

of their mental limitations. The defendant's assaults of the two women occurred in a similar manner as well. He used his supervisory authority to lure the women into an isolated, empty room on the upper level of the store while they were in the store pursuant to their employment duties. He then proceeded to assault them. In light of those similarities between the charged and uncharged misconduct, we cannot conclude that the court abused its discretion in determining that N's testimony was probative of a common plan or scheme perpetrated by the defendant. See *State* v. *Merriam*, supra, 264 Conn. 663, citing *State* v. *George B.*, supra, 258 Conn. 789–92 (defendant exhibited common scheme of behavior when both victims were related to one another and to defendant, and sexual misconduct occurred at same location); *State* v. *Kulmac*, supra, 230 Conn. 62–63 (defendant engaged in common plan or scheme because all three victims were young girls, defendant maintained close relationship with victims' families and defendant's sexual abuse of each victim bore certain similarities); *State* v. *Esposito*, supra, 192 Conn. 173–74 (defendant exhibited common scheme of behavior inasmuch as two victims were similar in age and defendant had consumed alcohol before using knife to force each victim to engage in oral sex and then vaginal intercourse); and *State* v. *Hauck*, supra, 172 Conn. 146–47 (trial court reasonably found common plan or scheme when defendant schoolteacher used position of authority to obtain or seek sexual favors from two female students in return for favorable academic evaluations). We conclude, therefore, that the court did not abuse its discretion in admitting the uncharged misconduct evidence on the basis of a common plan or scheme.

C

The defendant next argues that the court abused its discretion by failing to issue a limiting instruction concerning the jury's use of the uncharged misconduct

evidence, despite giving assurances to the contrary. Our review of the transcript reveals that the court did in fact issue the limiting instruction to the jury at several points during the course of the trial. Accordingly, the defendant's claim is without merit.

After the members of the jury were sworn in, the court made various preliminary remarks and gave the jury certain instructions. The court instructed the jury that evidence may be admissible for certain limited purposes only. Specifically, the court stated: "Now, some evidence may be admitted for a limited purpose only. And if this happens, I will explain [it] to you during the trial. But sometimes, something can be admitted for purpose A but not for purpose B. And if this happens, I will explain it to you during the trial. When I instruct you that an item of evidence has been admitted for a limited purpose only, you must consider it for that purpose only and for no other purposes."

During argument concerning the use of prior misconduct, the court ruled that such evidence was admissible but that it would provide the jury with a limiting instruction at the time the jury heard the evidence and during the charge. At the conclusion of N's direct examination, the court instructed the jury as follows: "The evidence that you just heard, namely, that the defendant engaged in certain conduct with [N] in April of 2000, has been admitted for two limited purposes. *Remember, I told you that certain evidence might be admitted for one purpose but not another. This evidence had been admitted first, to demonstrate or show a characteristic method or pattern in the commission of criminal acts and, second, on the issue of the defendant's intent.* The evidence of alleged prior misconduct by the defendant toward [N] is not part of the offense charged in this case. It is for you and you alone, ladies and gentlemen, to evaluate the testimony in this case, all of the testimony, including this testimony, and to determine

whether you credit it in whole, in part or not at all. *You are expressly prohibited from using this evidence that you have just heard, of prior alleged misconduct, as evidence of the bad character of the defendant or as evidence of a tendency to commit criminal acts in general or as proof that he committed the acts charged in this case for which he is being prosecuted.* The weight, if any, that you choose to give to this evidence is up to you. That is your job as jurors to evaluate the evidence." (Emphasis added.) Additionally, during the charge to the jury, the court made two specific references to the limited use of uncharged misconduct.[7]

---

[7] The court first stated that "[s]ome testimony and exhibits have been received for limited purposes, and where I have given a limiting instruction, you must follow it and consider such evidence for no purpose other than the limited purpose for which it was admitted."

The court later expanded on its instructions to the jury. "Now, I have told you a few times already, during my preliminary instructions, before the trial started, and during the trial also, that sometimes—and I mentioned it earlier in these instructions—that sometimes evidence is admitted for a limited purpose; meaning, that it may be considered for one purpose but not others. I talked to you about this during the trial, and there was some such evidence in this case. I will be discussing this with you further in a couple of minutes. *Evidence admitted for a limited purpose, as I have already told you, may be considered only for the purpose for which it was admitted and no other purpose.* . . .

"All right. Now, I have discussed this issue of the limiting instruction previously in connection with what is commonly called 'uncharged misconduct,' and I want to revisit that with you. I want to remind you of something I told you during the trial, and I am going to instruct you as I did during the trial to remind you of a limitation on certain evidence. The evidence which you heard during the trial, that the defendant engaged in sexual contact with [N] in April, 2000, was admitted for two limited purposes. That is, *it was admitted first to demonstrate or show a characteristic method or pattern in the commission of alleged criminal acts and, second, on the issue of the defendant's intent.* This evidence of alleged prior misconduct by the defendant toward [N] is not part of the offenses charged in this case. The charges against the defendant in this case relate to [the victim] only. It is for you and you alone to evaluate the testimony in this case, including [N's] testimony, and to determine whether you credit it in whole, in part or not at all. You are expressly prohibited from using this evidence of prior alleged misconduct relating to [N] as evidence of the bad character of the defendant or as evidence of a tendency to commit criminal acts in general or as proof that he committed the acts charged in this case for which he

As our lengthy recitation from the record demonstrates, the court clearly and indisputably provided the appropriate limiting instructions to the jury. We fail to see any merit in the defendant's claim to the contrary.

D

The defendant's final argument concerning the admission of uncharged misconduct is that the court improperly concluded that the probative value of the uncharged misconduct evidence outweighed any prejudicial effect. We are not persuaded.

"[E]vidence may be excluded by the trial court if the court determines that the prejudicial effect of the evidence outweighs its probative value. . . . Of course, [a]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be admitted. . . . The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jury." (Internal quotation marks omitted.) *State* v. *Bennett-Gibson*, 84 Conn. App. 48, 66, 851 A.2d 1214, cert. denied, 271 Conn. 916, 859 A.2d 570 (2004). The court bears the primary responsibility for conducting the balancing test to determine whether the probative value outweighs the prejudicial impact, and its conclusion will be disturbed only for a manifest abuse of discretion. See *State* v. *George B.*, supra, 258 Conn. 793. We are mindful of the difficult nature of conducting this balancing test in cases involving

is being prosecuted. The weight, if any, that you choose to give to [N's] testimony is up to you. If you find [N's] testimony as to prior alleged misconduct credible, you may consider it for the limited purpose of assisting you in determining whether the defendant has engaged in a characteristic method or pattern in the commission of criminal acts of which the charged conduct in this case is a part and on the issue of the defendant's intent." (Emphasis added.)

charges of sexual assault and prior sexual misconduct. See *State* v. *Gibson*, supra, 75 Conn. App. 111–12.

The defendant argues that the evidence pertaining to the uncharged misconduct, namely, N's testimony, was "enormously prejudicial" and "inflammatory," far outweighing its probative value. We do not agree.

Several factors in the present case increased the probative value of the uncharged misconduct evidence. First, because the assaults occurred in private and the case against the defendant thereby largely depended on the credibility of the victim, the evidence of the prior misconduct served to bolster the victim's credibility. See id. Second, the details between the assault of the victim and N were strikingly similar. Those facts not only increased the probative value; see *State* v. *Merriam*, supra, 264 Conn. 664; *State* v. *Madore*, 45 Conn. App. 512, 522–23, 696 A.2d 1293 (1997) (considerable similarities between misconduct resulted in evidence of uncharged misconduct being highly probative); but also lessened the prejudicial impact, as the jury already had heard the details of the crimes committed against the victim. See *State* v. *Cooper*, 227 Conn. 417, 427, 630 A.2d 1043 (1993). Finally, as noted in part I C, the court provided *numerous* limiting instructions to the jury concerning the use of uncharged misconduct evidence, which served to minimize the prejudicial impact of N's testimony. See *State* v. *Kulmac*, supra, 230 Conn. 63. We cannot conclude, therefore, that the court abused its discretion in balancing the uncharged misconduct's prejudicial impact against its probative value.

## II

The defendant next claims that the court improperly denied him due process of law. Specifically, the defendant argues that the court provided the jury with an incorrect statement of the common scheme or plan exception during its charge and improperly allowed the

state to refer to N and the victim as "borderline retarded" and "intellectually limited." We decline to review either of those unpreserved claims.

### A

The defendant first argues that the court provided the jury with an incorrect statement of the common scheme or plan exception, resulting in a denial of due process of law by diluting the state's burden of proof. The following additional facts are necessary to understand the defendant's claim. Prior to charging the jury, the court stated its dislike for the term "common scheme or plan" and informed the parties of its intent to replace that term with "characteristic method or pattern in the commission of criminal acts." The defendant did not object to that nor did he file a request to charge using the traditional nomenclature. That claim, therefore, is not preserved for our review.

The defendant requests that we review his claim pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[8] We acknowledge that the record is adequate for our review and turn to the second *Golding* prong.[9] At the outset, we note that our Supreme Court has instructed: "[J]ust as every claim of evidentiary error by the trial court is not truly constitutional in

---

[8] "In *Golding*, our Supreme Court held that a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; internal quotation marks omitted.) *State* v. *Pulaski*, 71 Conn. App. 497, 501 n.9, 802 A.2d 233 (2002).

[9] "[W]e remain free to dispose of [a] the claim by focusing on whichever condition is most relevant in the particular circumstances." (Internal quotation marks omitted.) *State* v. *Howard*, 88 Conn. App. 404, 411 n.2, 870 A.2d 8 (2005).

nature . . . every claim of instructional error is not truly constitutional in nature. . . . Indeed, it would trivialize the constitution to transmute a nonconstitutional claim into a constitutional claim simply because of the label placed on it by a party or because of a strained connection between it and a fundamental constitutional right. . . . Robing garden variety claims of improper jury instructions concerning evidentiary matters in the majestic garb of constitutional claims does not make such claims constitutional in nature." (Citation omitted; internal quotation marks omitted.) *State* v. *Schiappa*, 248 Conn. 132, 165–66, 728 A.2d 466, cert. denied, 528 U.S. 862, 120 S. Ct. 152, 145 L. Ed. 2d 129 (1999).

Our recent decision in *State* v. *Dews*, 87 Conn. App. 63, 864 A.2d 59, cert. denied, 274 Conn. 901, 876 A.2d 13 (2005), controls the issue. In discussing the claim that the court provided an inadequate charge with respect to the use of uncharged misconduct evidence, we stated: "We reiterate that as a general rule, the failure of the trial court to give a limiting instruction concerning the use of evidence of prior misconduct is not a matter of constitutional magnitude. . . . *State* v. *Ortiz*, 40 Conn. App. 374, 381, 671 A.2d 389, cert. denied, 236 Conn. 916, 673 A.2d 1144 (1996). *If the failure to give any limiting instruction is not of constitutional magnitude, it would follow that the claimed failure to give an adequate limiting instruction likewise is not of constitutional magnitude.*" (Emphasis added; internal quotation marks omitted.) *State* v. *Dews*, supra, 75. We conclude, therefore, that the defendant's unpreserved claim fails to meet the second prong of *Golding*.

B

The defendant next argues that the court improperly allowed the state to refer to N and the victim as "borderline retarded" and "intellectually limited." Specifically,

he claims that the court improperly allowed scientific evidence concerning the women's mental capacity in violation of the rules established by the United States Supreme Court in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and by our Supreme Court in *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997) (en banc), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998). The defendant contends that by allowing this type of evidence, the state was permitted to argue the similarities between N and the victim, thereby diluting the burden of proof with respect to the common plan or scheme exception to the general rule prohibiting the use of misconduct evidence. Simply put, the defendant argues that the evidence concerning the women's mental abilities was unsupported by any competent evidence and that this deprived him of a fair trial.

The following additional facts are necessary to resolve the defendant's claim. The state's first witness was Michael Morrissey, a police detective. He testified, without objection, that during his interview of the victim, she was "slow intellectually" and that he had obtained medical records indicating that she had a low IQ. Additionally, he stated that in order to facilitate the interview process, he avoided leading questions and used sentences with a simple structure and basic vocabulary. During the testimony of the victim's father, he acknowledged that she had some "mental limitations" that consisted of a learning disability and a diagnosis that she was "borderline mentally retarded." He also stated that she had attended special education classes. The victim's father also indicated that she had been tested and that her IQ score was low. Finally, he noted that she received disability income from the state as a result of her mental disability. The defendant failed to object to *any* of this testimony regarding the victim's disabilities.

During her testimony before the jury, N stated that she also had attended special education classes while attending high school. Furthermore, she acknowledged that she had problems learning, specifically, that she could not learn as fast as others. Those problems were demonstrated when she experienced difficulty working as a cashier at the supermarket. The defendant again failed to raise any objection to this testimony.

The defendant has argued in his brief that the court improperly admitted evidence concerning the disabilities of the victim and N. He specifically contends that it was "grossly unfair to have admitted evidence of such limitations via uncorroborated hearsay and weak inferences." Additionally, the defendant claims that this unsupported evidence diluted the state's burden of proof with respect to intent and common plan or scheme, depriving him of a fair trial.

We are not persuaded by the defendant's attempts to transform an evidentiary issue into one of constitutional magnitude. "Regardless of how the defendant has framed the issue, he cannot clothe an ordinary evidentiary issue in constitutional garb to obtain appellate review." (Internal quotation marks omitted.) *State* v. *Warren*, 83 Conn. App. 446, 452, 850 A.2d 1086, cert. denied, 271 Conn. 907, 859 A.2d 567 (2004); see also *State* v. *Toccaline*, 258 Conn. 542, 550, 783 A.2d 450 (2001). Even if we were to assume arguendo that such evidence was admitted improperly, the defendant has failed to establish a denial of fundamental fairness or the denial of a specific constitutional right. See *State* v. *Vilalastra*, 207 Conn. 35, 46, 540 A.2d 42 (1988). "[T]he defendant would have us place a constitutional label on what is not an error of constitutional proportion. [I]t would trivialize the constitution to transmute a nonconstitutional claim into a constitutional claim simply because of the label placed on it by a party or because of a strained connection between it and a fundamental

constitutional right. . . . [R]obing garden variety claims [of an evidentiary nature] in the majestic garb of constitutional claims does not make such claims constitutional in nature. . . . Putting a constitutional tag on a nonconstitutional claim will no more change its essential character than calling a bull a cow will change its gender." (Citation omitted; internal quotation marks omitted.) *State* v. *Dews,* supra, 87 Conn. App. 66–67.

Having recognized the defendant's claim as nothing more than one of evidentiary error, we may quickly dispose of it. "Our Supreme Court has stated that once identified, unpreserved evidentiary claims masquerading as constitutional claims will be summarily dismissed. . . . We previously have held that *Golding* does not apply to evidentiary claims, which, standing alone, do not rise to the level of constitutional magnitude that is required by *Golding*'s second prong." (Citation omitted; internal quotation marks omitted.) *State* v. *Jackson,* 86 Conn. App. 803, 811–12, 862 A.2d 880, cert. denied, 273 Conn. 909, 870 A.2d 1081 (2005).

### III

The defendant next claims that the court improperly refused to conduct an in camera review of the victim's confidential records from a rape crisis center to determine if they contained any evidence concerning her testimonial capacity and ability to perceive, to recall and to relate the events at issue. We disagree.

The following additional facts are necessary for our resolution of the defendant's claim. Prior to the start of the trial, the defendant subpoenaed the victim's records from the rape crisis center at which the victim was counseled. The defendant requested that the court, pursuant to the framework established in *State* v. *Bruno,* 236 Conn. 514, 673 A.2d 1117 (1996), and *State* v. *Esposito,* supra, 192 Conn. 166, conduct an in camera review

of the records to determine if they contained anything about the victim's mental health status that would cast doubt on her testimonial capacity.[10]

After the state had rested, the court held a hearing to determine whether to conduct an in camera review. The defendant called two witnesses, the first of whom was D, a volunteer crisis counselor at the center.[11] D had met with the victim at a hospital in June, 2001, the day after one of the assaults. D was aware that the victim had made allegations against the defendant from events that had occurred in the summer of 2000. D could not recall the victim claiming that an assault had occurred the previous December. D specifically testi-

---

[10] "In *Esposito*, our Supreme Court established the procedure for determining whether confidential psychiatric medical records should be turned over to the defendant for purposes of cross-examination. The court recognized the inherent tension between a patient's privacy interest concerning his or her medical records; see General Statutes § 52-146e; and the defendant's constitutional right to confront and cross-examine the state's witnesses. In order to balance these competing interests, the court developed the following procedure. If . . . the claimed impeaching information is privileged there must be a showing that there is reasonable ground to believe that the failure to produce the information is likely to impair the defendant's right of confrontation such that the witness' direct testimony should be stricken. Upon such a showing the court may then afford the state an opportunity to secure the consent of the witness for the court to conduct an in camera inspection of the claimed information and, if necessary, to turn over to the defendant any relevant material for the purposes of cross-examination. If the defendant does make such showing and such consent is not forthcoming then the court may be obliged to strike the testimony of the witness. If the consent is limited to an in camera inspection and such inspection, in the opinion of the trial judge, does not disclose relevant material then the resealed record is to be made available for inspection on appellate review. If the in camera inspection does reveal relevant material then the witness should be given an opportunity to decide whether to consent to the release of such material to the defendant or to face having her testimony stricken in the event of refusal." (Internal quotation marks omitted.) *State* v. *Boyd*, 89 Conn. App. 1, 11, 872 A.2d 477 (2005); see also *In re Robert H.*, 199 Conn. 693, 708–709, 509 A.2d 475 (1986).

[11] Pursuant to General Statutes § 52-146k (b), communications between a sexual assault counselor and a victim of sexual assault are privileged. See also *In re Robert H.*, 199 Conn. 693, 703, 509 A.2d 475 (1986).

fied that she could not recall the victim having any difficulty recalling the general time frame of the assault or that she displayed any ambiguity in her statements to David Ellsworth, a police officer. Finally, D indicated that on the basis of her personal observations, there was nothing to indicate that the victim could not relate events accurately.

Ellsworth then testified at the hearing. He indicated that the victim was unclear about whether the defendant had ejaculated in her mouth. He also noted in his report that the victim believed that she had been forced to engage in sexual contact "since last summer" and that that referred to her first employment period. He further explained that although the victim was unable to identify the specific time frame concerning the assaults, she did not display any ambiguity in her statements. Ellsworth also indicated that the victim was sure that the prior assault occurred before she terminated her employment. Finally, he specifically testified that he did not observe anything that caused him to doubt the victim's ability to perceive, recall or relate events accurately.

The defendant, during argument at the hearing, emphasized that the victim appeared to have difficulty with the chronology of events and that this affected her testimonial capacity to such a degree that an in camera review of her records was warranted. He also highlighted the fact that the victim displayed some uncertainty as to whether the defendant had ejaculated in her mouth. The prosecutor countered by noting that although the victim had difficulty with the precise dates of the events, she was able to correlate the event with her first period of employment. The prosecutor further downplayed the significance regarding the victim's statements as to whether the defendant had ejaculated and argued that victims of sexual assault often are unsure as to this issue.

The court declined to conduct the in camera review. In rejecting the defendant's request, the court pointed out that both of the witnesses indicated that the victim did not display any difficulty in recalling, perceiving or relating events. The court then ordered the records sealed for appellate review.[12]

A review of the relevant legal principles pertinent to the defendant's claim will facilitate our discussion. As a preliminary matter, we note that "Connecticut has a broad psychiatrist-patient privilege that protects the confidential communications or records of a patient seeking diagnosis and treatment. [General Statutes] §§ 52-146d, 52-146e . . . . C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 12.9.1." (Citations omitted; internal quotation marks omitted.) *State* v. *Kelly*, 208 Conn. 365, 379, 545 A.2d 1048 (1988). Our Supreme Court has held that records and communications between a sexual assault victim and a sexual assault counselor are similarly protected and subject to the *Esposito-Bruno* procedure before such information may be disclosed to the defendant. See *In re Robert H.*, 199 Conn. 693, 709–11, 509 A.2d 475 (1986); *State* v. *Kulmac*, supra, 230 Conn. 59.

The victim's right to privacy in such cases, however, often directly conflicts with the defendant's right to confront the state's witnesses. "The right to confrontation is fundamental to a fair trial under both the federal and state constitutions. . . . It is expressly protected by the sixth and fourteenth amendments to the United States constitution . . . and by article first, § 8, of the Connecticut constitution. . . . The defendant is guaranteed more than an opportunity to confront witnesses physically. . . . The right to confrontation secures to

---

[12] "A trial court has the absolute duty to mark for identification and seal for possible appellate review any such records offered, whether or not an in camera inspection is undertaken, even in the absence of an objection to its failure to do so from the parties." *State* v. *Bruno*, supra, 236 Conn. 538.

the defendant the opportunity to cross-examine witnesses against him . . . and to expose to the jury the facts from which the jurors . . . could appropriately draw inferences relating to the reliability of the witness." (Citations omitted; internal quotation marks omitted.) *State* v. *Hufford,* 205 Conn. 386, 400–401, 533 A.2d 866 (1987).

The defendant's argument focuses on his inability to conduct an adequate cross-examination of the victim. "It is well established that [a] criminal defendant has a constitutional right to cross-examine the state's witnesses, which may include impeaching or discrediting them by attempting to reveal to the jury the witnesses' biases, prejudices or ulterior motives, or facts bearing on the witnesses' reliability, credibility, or sense of perception. . . . Thus, in some instances, otherwise privileged records . . . must give way to a criminal defendant's constitutional right to reveal to the jury facts about a witness' mental condition that may reasonably affect that witness' credibility. . . . We are mindful, however, that the right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." (Citations omitted; internal quotation marks omitted.) *State* v. *Peeler,* 271 Conn. 338, 379–80, 857 A.2d 808 (2004); see also *State* v. *Slimskey,* 257 Conn. 842, 853–54, 779 A.2d 723 (2001).

The defendant contends that the court should have conducted an in camera review of the records to determine if there was information in them concerning the victim's ability to observe, to recollect and to narrate the events pertaining to the assault, which is the linchpin of determining whether he should have had access to the records. See *State* v. *Kelly,* supra, 208 Conn. 379–80; *State* v. *Storlazzi,* 191 Conn. 453, 459, 464 A.2d 829 (1983).

Before addressing the specifics of the defendant's arguments, we set forth the applicable standard of review. We review the court's conclusion that the defendant was not entitled to an in camera review of the victim's confidential records from the rape crisis center pursuant to our standard of review for the court's evidentiary rulings. "The trial court has wide discretion in its rulings on evidence and its rulings will be reversed only if the court has abused its discretion or an injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Gonzalez*, 75 Conn. App. 364, 381, 815 A.2d 1261 (2003), rev'd on other grounds, 272 Conn. 515, 864 A.2d 847 (2005); see also *State* v. *Betances*, 265 Conn. 493, 506, 828 A.2d 1248 (2003); *State* v. *Bruno*, supra, 236 Conn. 529–30. We note, however, that our Supreme Court has "urged trial courts to permit the defendant a certain latitude in his attempt to make [the necessary preliminary] showing." *State* v. *D'Ambrosio*, 212 Conn. 50, 60, 561 A.2d 422 (1989), cert. denied, 493 U.S. 1063, 110 S. Ct. 880, 107 L. Ed. 2d 963 (1990).

In the present case, the two witnesses called by the defendant during the hearing *both testified unequivocally* that the victim did not display *any* difficulties in observing, recollecting and narrating the details of the assaults perpetrated by the defendant. The defendant bore the burden of demonstrating that there was a reasonable ground to believe that the failure to produce the information was likely to impair his right of confrontation such that the victim's direct testimony should have been stricken. See *State* v. *Bruno*, supra, 236 Conn. 523. In this case, the defendant was required to establish, through the testimony of those persons with knowledge of the records, a factual basis from which the court could conclude that the records would reveal that, at the relevant time, the victim's testimonial capacity was affected so as to warrant further inquiry. Id. We emphasize that the issue is not the victim's general

character or intelligence but the existence of a mental problem affecting her capacity to observe, recall and narrate the pertinent events.

The fact that the victim displayed some ambiguity as to the precise time frame of the first set of assaults is insufficient to require an in camera review. The victim was able to relate the time frame of the assaults to her periods of employment. She was able, therefore, to recall and to relate the relevant events. Moreover, the fact that she was unable to describe the precise chronology of the events at issue does not rise to the level of the circumstances in which appellate courts have concluded that the trial court abused its discretion in denying the defendant's request for an in camera review. See *State* v. *D'Ambrosio*, supra, 212 Conn. 59 (defendant established that witness had been alcoholic, ordered by court to attend treatment for alcohol problem, used other drugs, consumed alcohol on day of incident); *State* v. *Hufford*, supra, 205 Conn. 404–405 (defendant established that at time of incident, witness was taken to hospital and was uncooperative, unwilling to talk rationally, diagnosed with various mental health issues, advised to obtain follow-up care).

With respect to the victim's uncertainty as to whether the defendant had ejaculated in her mouth, we similarly are persuaded that the court did not abuse its discretion in declining to perform an in camera review. The victim testified in front of the jury that she was unsure that this occurred. Counsel for the defendant cross-examined the victim regarding the matter, highlighted her uncertainty and impeached her credibility before the jury. "Where the trial court allows significant cross-examination concerning a witness' veracity, it cannot be said that the constitutional right to confrontation is implicated. . . . Although a lack of knowledge about the credibility of a witness implicates the constitutional right of confrontation, [t]hat lack of knowledge can

be ameliorated by an extensive and effective [cross-examination]." (Citations omitted; internal quotation marks omitted.) *State* v. *Gonzalez,* supra, 75 Conn. App. 383.

"While we are mindful that the defendant's task to lay a foundation as to the likely relevance of records to which he is not privy is not an easy one, we are also mindful of the witness' legitimate interest in maintaining, to the extent possible, the privacy of her confidential records." (Internal quotation marks omitted.) *State* v. *Walsh,* 52 Conn. App. 708, 722, 728 A.2d 15, cert. denied, 249 Conn. 911, 733 A.2d 233 (1999); see also *State* v. *Vargas,* 80 Conn. App. 454, 469–70, 835 A.2d 503 (2003), cert. denied, 267 Conn. 913, 840 A.2d 1175 (2004). In the present case, we conclude that the court did not abuse its discretion in declining to perform the requested in camera review of the victim's records.

## IV

The defendant next argues that the court improperly refused to suppress statements he made during a police interview. Specifically, he argues that the court improperly concluded that he had not been subjected to a custodial investigation. We are not persuaded.

The following additional facts are necessary for the resolution of the defendant's claim. The defendant filed a motion to suppress statements he made to police officers during an interview in the police station. The court held a hearing on the defendant's motion outside of the presence of the jury. During the hearing, the sole witness was Michael Morrissey, a police detective who conducted the investigation of the victim's allegations. Morrissey testified that in the middle of July, 2001, he went to the supermarket to speak with the defendant. The defendant invited Morrissey to an office on the upper level of the supermarket, and the two spoke for a period of time.

Morrissey subsequently scheduled another interview with the defendant. It took place at the police station approximately two weeks later. The defendant walked into the police station and was led to a second floor interview room. Morrissey described the room's dimensions as approximately twelve feet by twelve feet and containing a desk, computer and three chairs. The interview room did not have any windows or pictures on the walls.

Morrissey discussed the victim's allegations with the defendant, who was not under arrest, nor had he been given his warnings pursuant to *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). The defendant initially denied having had any sexual contact with the victim. At some point, Morrissey informed the defendant that if he had had a consensual sexual relationship with the victim, he had to tell him at that point. The defendant continued to maintain that he had never had a sexual relationship with the victim.

Morrissey testified that the defendant arrived at the police station voluntarily, the meeting had been arranged over the telephone, he was never placed in handcuffs or under arrest and never attempted to leave the interview room, which had remained unlocked at all times. Additionally, he stated that he did not arrest the defendant until weeks later. During questioning by the court, Morrissey stated that during the interview neither he nor the defendant left the room, the defendant was never threatened or coerced into talking and that the defendant was free to leave at all times.

Following the hearing, the defendant conceded that when he arrived at the police station, he was advised that he was not under arrest and was free to leave. He argued, however, that once Morrissey informed him that he had to disclose a consensual sexual relationship, the interview became custodial, and, therefore, in the

absence of any *Miranda* warnings, anything following that statement should be suppressed. Nevertheless, the court denied the defendant's motion.[13]

Morrissey then testified in front of the jury.[14] After repeating much of his testimony from the suppression hearing, he indicated that during the police station interview, he asked the defendant ten to twelve times if there had been any sexual contact with the victim and that the defendant denied any such contact. Morrissey testified that during the interview, he posed the following hypothetical: If Morrissey told him that the police had some physical evidence regarding the matter, would the defendant change his mind about whether he had engaged in any sexual contact with the victim? The defendant recanted his prior denials and admitted to having had a consensual sexual relationship with the victim. He denied having had nonconsensual sexual intercourse with the victim and indicated that the victim actively had commenced their relationship. The defen-

---

[13] In rejecting the defendant's arguments, the court stated: "[The defendant] freely went down to the police station. He was free to leave, he was not in any way restrained, he was not threatened, coerced, he was not handcuffed. At no time was he told he was under arrest. He never tried to leave, he never asked to leave, the door was open. And I understand the argument because there is some truth to the fact that any time a citizen is talking to the police, there is some inherently coercive aspect to it. That, to me, though, is a far cry from converting this into a custodial situation.

"And, I also would note that [the defendant] did not testify about this, and so that statement doesn't get you across the line that you have to cross here. So, the motion is denied based on the full evidence and on all the circumstances present, as I understand them. It is clear to me that this was not a custodial situation. In viewing it from the standpoint of a reasonable person, it was not a custodial situation and a reasonable person situated as [the defendant] was would not think that it was a custodial situation. He was free to leave at all times, failed to do so, gave a statement. Not custodial."

[14] "We may consider the testimony adduced both at the trial and at the suppression hearing when determining the propriety of the trial court's ruling on a motion to suppress a confession." (Internal quotation marks omitted.) *State* v. *Bjorklund*, 79 Conn. App. 535, 549 n.2, 830 A.2d 1141 (2003), cert. denied, 268 Conn. 920, 846 A.2d 882 (2004).

dant also indicated that he was aware of the victim's limited mental capacity. The defendant declined Morrissey's offer to make a written statement and, prior to leaving the police station, stated that the victim was "an adult" and "not naive." An audio recording of the interview at the police station was played for the jury.

We first identify the relevant legal principles and standard of review as set forth by our Supreme Court. "Two threshold conditions must be satisfied in order to invoke the warnings constitutionally required by *Miranda*: (1) the defendant must have been in custody; and (2) the defendant must have been subjected to police interrogation. . . . [A]lthough the circumstances of each case must certainly influence a determination of whether a suspect is in custody for purposes of receiving *Miranda* protection, the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. . . . A person is in custody only if, in view of all the surrounding circumstances, a reasonable person would have believed [that] he was not free to leave. . . . Further, the United States Supreme Court has adopted an objective, reasonable person test for determining whether a defendant is in custody. . . . Thus, in determining whether *Miranda* rights are required, *the only relevant inquiry is whether a reasonable person in the defendant's position would believe that he or she was in police custody of the degree associated with a formal arrest.* . . .

"The defendant bears the burden of proving that he was in custody for *Miranda* purposes. . . . Two discrete inquiries are essential to determine custody: [F]irst, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. . . . The first inquiry is factual, and we will not overturn

the trial court's determination of the historical circumstances surrounding [a] defendant's interrogation unless it is clearly erroneous. . . . The second inquiry, however, calls for application of the controlling legal standard to the historical facts. . . . The ultimate determination of whether a defendant was subjected to a custodial interrogation, therefore, presents a mixed question of law and fact, over which our review is de novo." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Turner*, 267 Conn. 414, 434–35, 838 A.2d 947, cert. denied, 543 U.S. 809, 125 S. Ct. 36, 160 L. Ed. 2d 12 (2004); see also *State* v. *Pinder*, 250 Conn. 385, 408–11, 736 A.2d 857 (1999).

We emphasize that *"Miranda* warnings are not required unless the defendant is in custody," and it is the defendant's burden to prove a custodial interrogation. (Internal quotation marks omitted.) *State* v. *Torres*, 85 Conn. App. 303, 311, 858 A.2d 776, cert. denied, 271 Conn. 947, 861 A.2d 1179 (2004). Furthermore, "[n]o definitive list of factors governs a determination of whether a reasonable person in the defendant's position would have believed that he or she was in custody. . . . Our jurisprudence instructs, however, that [w]hen [an] individual has not been arrested, a finding of custody *requires* some indication that the officer would not have heeded his or her request to depart." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id.

We have reviewed the transcript of the suppression hearing, Morrissey's testimony before the jury and the audiotape recording of the interview that occurred at the police station. Applying the well settled applicable standards, we conclude as a matter of law that the defendant's interview with Morrissey at the police station cannot be construed as having been custodial at any point. Morrissey, after a brief initial interview at the supermarket, arranged by telephone to speak with

the defendant at the police station. The defendant then voluntarily went to the police station to meet with Morrissey. "A suspect in a crime is not in custody every time he is asked questions at a police station." (Internal quotation marks omitted.) *State* v. *Casiano*, 55 Conn. App. 582, 588, 740 A.2d 435 (1999), cert. denied, 252 Conn. 942, 747 A.2d 518 (2000). The defendant was advised that he was not under arrest and that he was free to leave at any time. "Often, an important factor distinguishing a consensual encounter from a seizure is whether the police expressly informed the defendant that he was free to leave at the outset of the interview. . . . 2 W. LaFave, Search and Seizure (2d Ed.) § 5.12, p. 390 n.23." (Citation omitted.) *State* v. *Greenfield*, 228 Conn. 62, 71 n.10, 634 A.2d 879 (1993); see also *State* v. *Northrop*, 213 Conn. 405, 414–15, 568 A.2d 439 (1990) (defendant who was told he was free to leave does *not meet in custody requirement*). The defendant never asked to end the interview or to leave. See *State* v. *Atkinson*, 235 Conn. 748, 760 n.18, 670 A.2d 276 (1996). Morrissey did not subject the defendant to any type of restraint, such as handcuffs, or place him in a locked or secure room. The defendant failed to adduce any evidence that he was threatened or coerced into speaking with Morrissey. The defendant, at the conclusion of the interview, was free to leave the police station and to ignore Morrissey's request that he give a written statement. As to Morrissey's statement that the defendant had to reveal a consensual sexual relationship at a certain time during the interview, we conclude that even if we afford that statement the interpretation most favorable to the defendant, it did not transform the noncustodial setting to a custodial one, as there were no indicia of restraint. We agree with the court that the statement would not have convinced a reasonable person that the defendant had to answer Morrissey's question or that he could not leave. In short, the defen-

dant failed to demonstrate any indication that Morrissey would not have heeded his request to terminate the interview and to depart from the police station. See *State* v. *Torres,* supra, 85 Conn. App. 311. Indeed, the defendant did leave and was not arrested until weeks later.

On the basis of the circumstances in this case, we conclude that the court properly found that the defendant was not in custody and, accordingly, that his *Miranda* rights had not yet attached. See generally *State* v. *Lapointe,* 237 Conn. 694, 724–27, 678 A.2d 942, cert. denied, 519 U.S. 994, 117 S. Ct. 484, 136 L. Ed. 2d 378 (1996); *State* v. *Rasmussen,* 225 Conn. 55, 77, 621 A.2d 728 (1993). Accordingly, the court properly denied the defendant's motion to suppress his statement.

V

The defendant's final claim is that § 53a-92 (a) (2) (A) is unconstitutionally vague as applied to the facts supporting his conviction of kidnapping in the first degree.[15] Although the defendant concedes that our Supreme Court has held that an individual may be convicted of both sexual assault and kidnapping as a result of conduct stemming from the same incident, he argues that under the facts and circumstances of the present case and the evidence adduced at trial, § 53a-92 (a) (2) (A) did not place him on notice that his conduct was sufficient to violate the statute. We disagree with the defendant with respect to the 2001 assault but agree with him with respect to the second assault committed in 2000.[16]

[15] Despite the defendant's failure to preserve this claim at trial, we review the claim because it implicates the fundamental due process right to fair warning, and the record is adequate to facilitate review. See *State* v. *Tweedy,* 219 Conn. 489, 502 n.11, 594 A.2d 906 (1991); see also *State* v. *Schriver,* 207 Conn. 456, 458–59, 542 A.2d 686 (1988).

[16] "One is reminded here of what Justice Felix Frankfurter may have meant when he said: It is a fair summary of history to say that the safeguards of liberty have frequently been forged in controversies involving not very nice people. *United States* v. *Rabinowitz,* 339 U.S. 56, 69, 70 S. Ct. 430, 94

As a preliminary matter, we note "[t]he void for vagueness doctrine is a procedural due process concept that originally was derived from the guarantees of due process contained in the fifth and fourteenth amendments to the United States constitution. The Connecticut constitution also requires that statutes with penal consequences provide sufficient notice to citizens to apprise them of what conduct is prohibited. . . . The constitutional injunction that is commonly referred to as the void for vagueness doctrine embodies two central precepts: the right to fair warning of the effect of a governing statute or regulation and the guarantee against standardless law enforcement. . . . If the meaning of a statute can be fairly ascertained a statute will not be void for vagueness since [m]any statutes will have some inherent vagueness, for [i]n most English words and phrases there lurk uncertainties." (Citations omitted; internal quotation marks omitted.) *State* v. *Burton*, 258 Conn. 153, 158–59, 778 A.2d 955 (2001).

We have stated that "[a]s a general rule, when a statute is attacked as void for vagueness, its validity is determined by its application to the particular facts at issue. . . . In challenging the constitutionality of a statute, the defendant bears the heavy burden of establishing beyond a reasonable doubt that the statute is in fact unconstitutional. . . . On appeal, a court will indulge in every presumption in favor of a statute's constitutionality. . . . If a penal statute provides fair warning, it will survive a vagueness attack. . . .

"If the meaning of a statute can be fairly ascertained a statute will not be void for vagueness since [m]any statutes will have some inherent vagueness. . . . This court must also look to see whether a person of ordinary

L. Ed. 653 (1950) (Frankfurter, J., dissenting)." (Internal quotation marks omitted.) *State* v. *Pelletier*, 196 Conn. 32, 35, 490 A.2d 515 (1985) (*Healey*, *J.*, concurring).

intelligence would reasonably know what acts are permitted or prohibited by the use of his common sense and ordinary understanding." (Internal quotation marks omitted.) *State* v. *Weiner*, 61 Conn. App. 738, 747–48, 767 A.2d 1220, cert. denied, 256 Conn. 902, 772 A.2d 600 (2001).

"As a threshold matter, it is necessary to discuss the applicable standard of review. A statute is not void for vagueness unless it clearly and unequivocally is unconstitutional, making every presumption in favor of its validity. . . . To demonstrate that [a statute] is unconstitutionally vague as applied to him, the [defendant] therefore must . . . demonstrate beyond a reasonable doubt that [he] had inadequate notice of what was prohibited or that [he was] the victim of arbitrary and discriminatory enforcement. . . . [T]he void for vagueness doctrine embodies two central precepts: the right to fair warning of the effect of a governing statute . . . and the guarantee against standardless law enforcement. . . . References to judicial opinions involving the statute, the common law, legal dictionaries, or treatises may be necessary to ascertain a statute's meaning to determine if it gives fair warning. . . .

"The general rule is that the constitutionality of a statutory provision being attacked as void for vagueness is determined by the statute's applicability to the particular facts at issue. . . . To do otherwise, absent the appearance that the statute in question intrudes upon fundamental guarantees, particularly first amendment freedoms, would be to put courts in the undesirable position of considering every conceivable situation which might possibly arise in the application of [the statute]. . . . Thus, outside the context of the first amendment, in order to challenge successfully the facial validity of a statute, a party is required to demonstrate as a threshold matter that the statute may not be applied constitutionally to the facts of [the] case." (Internal

quotation marks omitted.) *State* v. *Bloom*, 86 Conn. App. 463, 467–68, 861 A.2d 568 (2004), cert. denied, 273 Conn. 911, 870 A.2d 1081 (2005).

Prior to addressing the specific arguments raised by the defendant, we identify certain general legal principles that guide our analysis. Although at common law, kidnapping was a misdemeanor; see 1 Am. Jur. 2d, Abduction and Kidnapping § 4, p. 175 (1994); see also *People* v. *Petre*, 151 Misc. 2d 543, 544, 573 N.Y.S.2d 834 (1991); our jurisprudence has long classified the crime as a felony. See General Statutes § 53a-92. The classification of criminal conduct as kidnapping when such conduct is integral to and intertwined with other serious felonies such as murder, robbery and sexual assault has provided a difficult and troublesome area of criminal law. See annot., 39 A.L.R.5th 283 (1996); F. Parker, "Aspects of Merger in the Law of Kidnapping," 55 Cornell L. Rev. 527 (1970). As a result, various tests have been developed to determine whether conduct that constitutes other crimes may also be used to support a kidnapping conviction. For example, the Michigan Supreme Court has held that a kidnapping conviction may stand as long as "the confinement and asportation are not merely incidental to the lesser underlying crime." *People* v. *Adams*, 389 Mich. 222, 235–36, 205 N.W.2d 415 (1973); see also *State* v. *Goodhue*, 175 Vt. 457, 464, 833 A.2d 861 (2003). The Iowa Supreme Court established a more stringent three part test. It provides that in order to constitute kidnapping, conduct must not be slight or merely incidental to the other crime, must not be of the kind inherent in the nature of the other crime and must have some significance to the other crime that makes the commission of the other crime easier or lessens the risk of detection. *State* v. *Rich*, 305 N.W.2d 739, 745 (Iowa 1981).[17] That holding

[17] In *Rich*, the defendant was charged with, inter alia, kidnapping in the first degree and sexual assault in the third degree. Although the Iowa Supreme Court acknowledged that there is no minimum period of confine-

was premised, in part, on the fact that most cases of sexual assault involve some degree of confinement and that the penalties for kidnapping are much more significant than for certain degrees of sexual assault. Id., 742–45; see also *Virgin Islands* v. *Berry*, 604 F.2d 221, 226 (3d Cir. 1979).

The Vermont Supreme Court has stated that the traditional approach of kidnapping statutes provides that any asportation or detention of a victim is sufficient to sustain a kidnapping conviction. *State* v. *Goodhue*, supra, 175 Vt. 461. The modern, majority approach, however, is that kidnapping statutes do not apply to unlawful confinements or movements that are incidental to the commission of other felonies. Id., 462–63.

The landmark case concerning the modern approach to the issue is *People* v. *Levy*, 15 N.Y.2d 159, 204 N.E.2d 842, 256 N.Y.S.2d 793 (1965). In that case, the New York Court of Appeals stressed that the traditional approach to kidnapping "could literally overrun several other crimes, notably robbery and rape, and in some circumstances assault, since the detention and sometimes confinement, against the will of the victim, frequently accompany these crimes. . . . It is a common occurrence in robbery, for example, that the victim be confined briefly at gunpoint or bound and detained, or moved and left in another room or place." Id., 164.

The *Levy* approach has been described as the merger doctrine. "The merger doctrine was of judicial origin and was based on an aversion to prosecuting a defendant on a kidnapping charge in order to expose him to the heavier penalty thereby made available, where the

---

ment required for a kidnapping conviction, the confinement "must definitely exceed that normally incidental to the commission of sexual abuse. Such confinement or removal must be more than slight, inconsequential, or an incident inherent in the crime of sexual abuse so that it has a significance independent from sexual abuse." *State* v. *Rich*, supra, 305 N.W.2d 745.

period of abduction was brief, the criminal enterprise in its entirety appeared as no more than an offense of robbery or rape, and there was lacking a genuine 'kidnapping' flavor . . . ." (Citations omitted.) *People* v. *Cassidy*, 40 N.Y.2d 763, 765–66, 358 N.E.2d 870, 390 N.Y.S.2d 45 (1976).

Our Supreme Court, however, expressly has rejected the merger doctrine and eschewed the modern majority approach in favor of the traditional one. See *State* v. *Amarillo*, 198 Conn. 285, 304–305, 503 A.2d 146 (1986). In *State* v. *Chetcuti*, 173 Conn. 165, 377 A.2d 263 (1977), the court noted that "the legislature of this state has seen fit not to merge the offense of kidnapping with sexual assault or with any other felony. *Nor has the legislature imposed any time requirement for the restraint, nor any distance requirement for the asportation to constitute the crime of kidnapping.*" (Emphasis added.) Id., 170. Furthermore, our Supreme Court "has repeatedly held that if the state proves all of the elements of kidnapping, including the specific intent to restrain, beyond a reasonable doubt, the defendant may be convicted of kidnapping in addition to another felony, even though the two offenses arose out of the same conduct. . . . Contrary to the defendant's argument, the double jeopardy clause does not prohibit separate convictions for kidnapping and rape arising out of the same transaction. Under the rule of *Blockburger* v. *United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932), a defendant may be convicted of two offenses arising out of the same criminal incident if each crime contains an element not found in the other." (Citations omitted.) *State* v. *Vass*, 191 Conn. 604, 614–15, 469 A.2d 767 (1983); *State* v. *Briggs*, 179 Conn. 328, 338–39, 426 A.2d 298 (1979), cert. denied, 447 U.S. 912, 100 S. Ct. 3000, 64 L. Ed. 2d 862 (1980).

We now set forth the pertinent language with respect to our kidnapping statute at issue in the present case.

"A person is guilty of kidnapping in the first degree, pursuant to . . . § 53a-92 (a) (2) (A), if he abducts another person and . . . restrains the person abducted with intent to . . . inflict physical injury upon him or violate or abuse him sexually . . . . General Statutes § 53a-91 (2) defines abduct as restrain[ing] a person with intent to prevent his liberation by either (A) secreting or holding him in a place where he is not likely to be found, or (B) using or threatening to use physical force or intimidation. The term restrain is also defined in § 53a-91 (1) as restrict[ing] a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent." (Internal quotation marks omitted.) *State* v. *Wilcox*, 254 Conn. 441, 464–65, 758 A.2d 824 (2000). Kidnapping in the first degree is a specific intent crime. See *State* v. *Green*, 55 Conn. App. 706, 715, 740 A.2d 450 (1999), cert. denied, 252 Conn. 920, 744 A.2d 438, cert. denied, 529 U.S. 1136, 120 S. Ct. 2019, 146 L. Ed. 2d 966 (2000).

The defendant's claim of vagueness as it relates to our kidnapping statute has been raised on several occasions in the appellate courts of this state. See, e.g., *State* v. *Troupe*, 237 Conn. 284, 313–15, 677 A.2d 917 (1996); *State* v. *Tweedy*, 219 Conn. 489, 502–504, 594 A.2d 906 (1991); *State* v. *Jones*, 215 Conn. 173, 177–80, 575 A.2d 216 (1990); *State* v. *Ortiz*, 83 Conn. App. 142, 156–61, 848 A.2d 1246, cert. denied, 270 Conn. 915, 853 A.2d 530 (2004); *State* v. *Hill*, 58 Conn. App. 797, 799–802, 755 A.2d 919, cert. denied, 254 Conn. 936, 761 A.2d 763 (2000); see also *State* v. *Luurtsema*, 262 Conn. 179, 204–206, 811 A.2d 223 (2002) (*Borden, J.*, concurring), 208–13 (*Katz, J.*, dissenting in part). Although neither our Supreme Court nor this court has held the kidnapping statute to be unconstitutionally vague as applied,

it has been stated often that a factual scenario could exist in which charging a defendant with kidnapping on the basis of the most minuscule restraint would produce an absurd and unconscionable result. *State* v. *Troupe*, supra, 315. We believe that such a scenario exists in the present case, a case that is factually dissimilar in significant ways from other cases in which the issue has been considered and rejected. Accordingly, we must contrast the facts in the other cases addressing the issue with those in the present case in order to demonstrate that *this* defendant's vagueness as applied challenge is successful.

In *Troupe*, the victim met the defendant while walking home on a Sunday morning, exchanged telephone numbers with him but declined his invitation to see him that night. Id., 287–88. Months later, they planned to go shopping, and the victim drove to the defendant's apartment. Id., 288. The victim agreed to wait in his apartment while he finished getting ready. Id. She subsequently attempted to leave, and the defendant asked her to stay and began to touch her inappropriately. Id., 288–89. On two occasions, the victim broke free of the defendant's grasp and attempted to escape but was unsuccessful. Id., 289. The defendant then sexually assaulted her and prevented her from leaving until he had finished dressing. Id. Our Supreme Court, in rejecting the defendant's vagueness challenge, stated: "The state adduced evidence that the defendant refused to allow the victim to leave his apartment several times before, during and after the sexual assault took place. The victim first attempted to leave the defendant's apartment when she realized that he was not interested in going shopping with her. The defendant, ignoring the victim's repeated requests that she be permitted to return to her car, prevented her from doing so by kneeling down in front of her and forcing her to remain on the couch. When the victim resisted and sought to leave,

the defendant succeeded in pulling her down to the floor. The victim eventually managed to escape his grasp and, once again, tried to flee. The defendant, however, barred her departure by force. Finally, after the defendant had sexually assaulted the victim, he detained her in the apartment until he had finished dressing. Thus, the defendant restrained the victim for a considerable period of time by repeatedly and forcibly thwarting her efforts to leave the apartment." (Emphasis added.) Id., 315.

In *Tweedy*, the defendant followed the victim into her apartment building and ordered her into her apartment. *State* v. *Tweedy*, supra, 219 Conn. 492. He warned her not to scream because he had a gun. Id. The victim entered her apartment and unsuccessfully attempted to lock the defendant out. Id. The defendant demanded money from the victim, who complied and went to the bedroom to get additional money. Id., 493. The defendant followed her and began to search the bedroom for additional valuables. Id. After obtaining some of her jewelry, he forced her onto the bed and sexually assaulted her. Id. Following that assault, he escorted the victim several blocks to an automatic teller machine and forced her to withdraw additional money. Id., 493–94. In rejecting the defendant's claim, our Supreme Court noted that the defendant, after forcing his way into the apartment, on several occasions forced the victim to move between different locations within the apartment. Id., 503.

In *Jones*, the victim was jogging in a park on a paved path that was two car widths wide. *State* v. *Jones*, supra, 215 Conn. 175. The defendant approached her from the opposite direction and proceeded to grasp her shoulders and drag her off the pathway and into a wooded area. Id. He then threw her to the ground while clutching her jaw in his hand and attempting to smother her. Id. Although the defendant raised his arms as if to strike

her, she was able to kick the defendant and escape. Id., 175–76. Our Supreme Court stated: "Specifically, we conclude that this defendant clearly moved his victim 'from one place to another' pursuant to §§ 53a-91 (1) and 53a-92 (a) (2) (A). The victim was jogging down the center of the road through the park. Upon seeing the defendant, she moved to the left of the road. The defendant then grabbed her and dragged her to the right until she was completely off the road. Photographs of the road where the victim was attacked indicate that it was two car-widths wide and surrounded on both sides by a heavily wooded area. In sum, we conclude that the victim was clearly moved 'from one place to another,' and therefore § 53a-92 (a) (2) (A) is not unconstitutionally vague under the facts of this case." Id., 180.

In *Ortiz*, the victim, who lived and worked with the defendant, became fearful of him after he became angry as a result of missing his meeting with a drug dealer. *State* v. *Ortiz*, supra, 83 Conn. App. 145. Following her unsuccessful attempt to obtain police assistance, the defendant put his arms around her waist and carried her away from the police substation. Id. He displayed an open box cutter and, after binding her wrists, slashed her face several times. Id. The defendant also inflicted deep lacerations to her hand and leg. Id. In rejecting the defendant's vagueness as applied challenge, we stated: "Testimony from the victim established that the defendant physically lifted her off of the ground to move her out of the police substation in which she had sought help, and when the victim attempted to flee, he grabbed her by her coat to prevent her from escaping. The victim also testified that the defendant twice grabbed her wrists with one hand as he cut her repeatedly with the other, once while she was standing and then again when she fell to the ground. The testimony elicited at trial established that the defendant intended to abduct the victim in that he restrained her by both moving her

from one place to another and also by preventing her liberation through the use of physical force. The facts do not support the defendant's contention that these actions comprised a miniscule movement." (Internal quotation marks omitted.) Id., 159–60.

In *Hill*, the defendant, after his offer of "friendship" was rejected, forced the victim from the street, along a driveway and into a parking lot. *State* v. *Hill*, supra, 58 Conn. App. 799. He restrained her by holding onto her wrists and arms and by placing his hand over her mouth. Id. The defendant then sexually assaulted the victim. Id. In response to the defendant's argument that there was no evidence of a restraint beyond what was needed to accomplish the sexual assault and that therefore his kidnapping conviction was the result of an absurd and unconscionable result, we stated: "It is clear from the facts, which obviously were found by the jury, that the defendant, without the victim's consent, moved the victim from the street to the place of the rape by pushing and directing her, and that once there he confined her, again without her consent, when she attempted to leave. Either action is sufficient to constitute restraint under the statute. It matters not that the defendant's underlying motive in either moving the victim from the street to the stairwell, or in confining her there, was to accomplish a rape. Such intent does not preclude a conviction for kidnapping." Id., 802.

Finally, we are guided by our Supreme Court's recent decision in *State* v. *Luurtsema*, supra, 262 Conn. 179. In that case, the defendant visited the victim in her apartment, where the two consumed alcohol and smoked crack cocaine. Id., 183. Although the victim previously had consented to receiving oral sex from the defendant, he subsequently attempted to sexually assault her by pulling her to the floor, removing her pants and underpants and forcing her legs apart in a harsh manner. Id. The defendant also choked the victim

to the point that she could not breathe. Id. On appeal, the defendant did not raise a vagueness challenge, but instead argued that there was insufficient evidence to support his conviction for kidnapping in the first degree. Id., 200. Our Supreme Court noted that "[w]e recognize that common notions regarding the crime of kidnapping envisage the carrying away of a person under coercion and restraint. Although this type of movement undoubtedly can serve as the basis for kidnapping, our kidnapping statute does not require such movement. Rather, all that is required under the statute is that the defendant have abducted the victim and restrained her with the requisite intent. . . . Under the aforementioned definitions, the abduction requirement is satisfied when the defendant restrains the victim with the intent to prevent her liberation through the use of physical force. Further, the victim is restrained when the defendant, acting with the intent to inflict physical injury upon her or sexually abuse her, moves her from one place to another or restricts her movement by confining her in the place where the restriction commenced. Nowhere in this language is there a requirement of movement on the part of the victim. Rather, we read the language of the statute as allowing the restriction of movement alone to serve as the basis for kidnapping. Therefore, the relevant inquiry under our kidnapping statute is whether any movement, or restriction of movement, was accomplished with the intent to prevent the victim's liberation." (Citation omitted.) Id., 201–202. The court also reiterated the principle that our kidnapping statute does not require any temporal or distance requirements and that it does not merge with an underlying felony. Id., 202. After rejecting the sufficiency claim, the court specifically noted that the defendant failed to raise the issue of whether the kidnapping statute was unconstitutionally vague as applied to those facts. Id., 203–204. The viability of the vagueness issue, however, resulted in a concurring opinion and a dissenting opinion.

The question that remains before this court is whether the defendant's conviction of either of the two counts of kidnapping in the first degree produced an absurd or unconscionable result. In resolving that issue, we must examine both the 2001 assault as well as the 2000 assaults.[18]

In reviewing the evidence with respect to the 2001 assault, we conclude that a person of reasonable intelligence would understand that such conduct was prohibited and that the conviction is not an absurd or unconscionable result. After enticing the victim into the isolated room, the defendant forced her to sit in a chair and proceeded to position his body so as to restrain her effectively and to prohibit her from leaving. The defendant essentially straddled the chair and locked his hands behind the victim's head and forced her to perform oral sex on him for several minutes. While maintaining his position, the defendant then proceeded

---

[18] Count four of the information charged the defendant with kidnapping in the first degree stemming from events that occurred in 2000. There was evidence adduced at trial concerning two sexual assaults and two kidnappings that occurred during this time period. As we have noted, the court instructed the jury that it could convict on count four as long as it agreed on the same kidnapping. Of course, the defendant is unable to clarify a general verdict, and, therefore, it is unknown specifically which 2000 events formed the basis of the conviction with respect to count four. See *Dowling* v. *Finley Associates, Inc.*, 49 Conn. App. 330, 338, 714 A.2d 694 (1998), rev'd on other grounds, 248 Conn. 364, 727 A.2d 1245 (1999); see also *State* v. *Blake*, 63 Conn. App. 536, 543, 777 A.2d 709, cert. denied, 257 Conn. 911, 782 A.2d 134 (2001); *State* v. *Lewis*, 46 Conn. App. 691, 696, 700 A.2d 722, cert. denied, 243 Conn. 944, 704 A.2d 799 (1997). Accordingly, the defendant would be wrongly convicted if he was convicted under an alternative basis for which there was no evidence, and a conviction cannot stand unless both of the alternate bases for the conviction are constitutional. See *State* v. *Linares*, 32 Conn. App. 656, 673, 630 A.2d 1340 (1993), rev'd in part on other grounds, 232 Conn. 345, 655 A.2d 737 (1995). "A conviction must be set aside if one of the alternate grounds supporting the verdict is unconstitutional or if one is not sufficiently supported by the evidence. [*State* v. *Reid*, 193 Conn. 646, 667 n.22, 480 A.2d 463 (1984)]; *State* v. *Marino*, 190 Conn. 639, 651, 462 A.2d 1021 (1983); see *Leary* v. *United States*, 395 U.S. 6, 30, 89 S. Ct. 1532, 23 L. Ed. 2d 57 (1969)." *State* v. *Linares*, supra, 673.

to penetrate the victim's vagina with his finger. Such restraint was neither minor nor an essential part of the crime of sexual assault in the first degree. The defendant's conviction of kidnapping in the first degree with respect to the criminal activity in 2001, as charged in count two of the information, therefore, was not based on an unconstitutionally vague statute as applied to his actions.

With respect to what we have identified as the second assault that occurred in 2000, the evidence at trial supported the following finding of facts. The victim was told to enter an isolated room with the defendant. The door may or may not have been locked. The defendant removed the victim's pants and underwear. The defendant penetrated the victim with his penis, and she immediately told him that it hurt, got up and left the room. There was no testimony as to the duration of the assault or how long the two were in the room. There was no evidence as to any amount of force used by the defendant at any point. Furthermore, it is unclear whether the defendant restrained the victim at any time because the evidence demonstrated that she was able to leave the room without being stopped. Thus, the second assault is significantly factually distinguishable from those cases in which the appellate courts of this state have rejected challenges based on statutory vagueness as applied.

In the other cases that have addressed this claim, some type of unlawful movement or restraint of the victim preceded the commission of the sexual assault. For example, in *Troupe*, the victim was held against her will in the defendant's apartment, even after she had attempted to break free. *State* v. *Troupe*, supra, 237 Conn. 289. Similarly, in *Tweedy*, the defendant blocked the victim's escape from her own apartment and forced her to remain in certain rooms while he committed other criminal acts. *State* v. *Tweedy*, supra,

219 Conn. 503. Likewise, the defendants in *Jones* and *Hill* forced their victims off the street so that they could facilitate further criminal activity. None of those circumstances appears in the second assault in 2000 that occurred in the present case. See *State* v. *Jones*, supra, 215 Conn. 175; *State* v. *Hill*, supra, 58 Conn. App. 799. The common factor in all of those cases, as opposed to the present case, is the occurrence of some act by the defendant, perhaps minuscule, of restraint or movement of the victim that was not essential to the underlying assault.

We are left with the factual scenario in which a conviction of kidnapping is an absurd and unconscionable conviction. We believe that such a minimal amount of restraint cannot support the defendant's conviction of kidnapping in the first degree. On the basis of the facts and circumstances, we conclude that the kidnapping charge did not put the defendant on notice that his conduct in sexually assaulting the victim violated the kidnapping statute. Furthermore, to allow such a conviction to remain would result in the encouragement of arbitrary and discriminatory enforcement of the kidnapping statute by overzealous prosecutors. We conclude that the defendant could not have received fair notice that his conduct, with respect to the second assault, constituted kidnapping in the first degree. All of the concerns regarding the misuse of a kidnapping statute that have caused other states to adopt a different test, such as the merger doctrine, are present in this case. Were the conviction to be affirmed, conduct that would lead the state to charge an individual with sexual assault or certain types of assaults or robberies would encourage a charge and virtually necessitate a conviction of kidnapping, depending on the prosecutor's unbridled discretion in bringing such additional charges. For these reasons, and because the facts pertaining to the second assault cannot sustain a conviction

of kidnapping, the conviction with respect to count four of the information must be vacated. Therefore, we need not address whether the facts concerning the first assault in 2000 could also support a kidnapping conviction. See footnote 18.

The judgment is reversed only as to the conviction of kidnapping in the first degree on count four of the information and the case is remanded with direction to render judgment of not guilty as to that count only. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.