STATE OF CONNECTICUT *v.* JEFF BLAKE
(AC 27293)

Bishop, Lavine and Pellegrino, Js.

the appellate clerk, and the court may, upon such a motion, direct any action it deems proper. . . ."

Argued November 29, 2007—officially released March 18, 2008

*Darcy McGraw*, special public defender, for the appellant (defendant).

*Margaret E. Kelley*, senior assistant state's attorney, with whom, on the brief, was *Jonathan C. Benedict*, state's attorney, for the appellee (state).

*Opinion*

BISHOP, J. The defendant, Jeff Blake, appeals from the judgment of conviction, following a jury trial, of sexual assault in the first degree in violation of General

Statutes § 53a-70 (a) (1), sexual assault in the second degree in violation of General Statutes § 53a-71 (a) (1) and risk of injury to a child in violation of General Statutes § 53-21. On appeal, the defendant claims that the court improperly (1) concluded that he had failed to make a sufficient preliminary showing to warrant an in camera examination of the victim's psychiatric records and (2) admitted DNA evidence through the state's expert witness. We affirm the judgment of the trial court.

The jury reasonably could have found the following relevant facts. In May, 1993, the victim was fourteen years old and was living with her mother and her thirteen year old sister. At the time of the incident, the victim's mother was not at home. The victim's mother had been dating the defendant for a few years. On May 3, 1993, the defendant arrived at the victim's home after 8 p.m., entered the home and kissed her on the left side of her neck. The defendant grabbed both of the victim's arms and led her into the living room where he "nudged" her onto the couch, pulled her shorts and underpants down and had sexual intercourse with her. The defendant told the victim not to tell anybody what had happened. The defendant pulled a red handkerchief from his pocket and wiped himself and the semen that had spilled on the sofa. The defendant then went upstairs to the bedroom of the victim's mother, and the victim went upstairs and took a bath. When the victim's mother arrived home about twenty minutes later, the victim did not tell her mother what had occurred with the defendant. The defendant stayed the night, which was not uncommon, and when he left the next morning, they did not see him again.

The next day, after school, the victim told her mother about the sexual assault. Her mother then took her to a hospital to be examined. Forensic examination did not reveal the presence of any semen, and there were

no signs of bruising or other evidence of physical assault. After the victim gave a statement to the police, the defendant was charged with sexual assault in the first degree, sexual assault in the second degree and risk of injury to a child.

Following a jury trial, the defendant was found guilty of all charges and was sentenced to a total effective term of forty years incarceration suspended after thirty years with five years probation and special conditions of parole. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the court improperly concluded that he failed to make a sufficient preliminary showing to warrant an in camera examination of the victim's psychiatric records. We are unpersuaded.

The following additional factual and procedural predicate is necessary to the resolution of the defendant's claim. On January 28, 2005, the defendant filed a motion for disclosure of the victim's psychiatric records for "the period of 1990 to . . . date." On April 13, 2005, the defendant filed an additional motion for disclosure of the victim's psychiatric records in pursuit of his right of confrontation. In support of his motions, the defendant referred to the victim's hospital record of May 4, 1993, and the impact letter the victim wrote to the court dated January 18, 2003.[1] On the basis of his reading of the victim's hospital record of May 4, 1993, the defendant asserted that the victim had been hospitalized twice prior to the time of the subject incident as a result of attempting to commit suicide. According to

---

[1] Interestingly, the defendant conceded before the trial court on April 13, 2005, that the victim's January 18, 2003 letter would not suggest that her mental state was so impaired as to impact her ability to testify. In fact, the defendant characterized the letter as "rambling but lucid and . . . certainly coherent."

the victim's 2003 letter to the court, she had also been hospitalized for psychiatric reasons at some time after the date of the alleged assault. In her letter to the court, the victim claimed that she had been sexually assaulted by seven people other than the defendant, one assault being a gang rape by six men and the other an assault by her uncle, but that she never pressed charges for these assaults. The victim indicated that she wanted to kill herself from time to time because she believed that no one cared about her and that she did not want her mother involved in these proceedings because her mother did not support her in the wake of her other assaults. In support of his request for an inspection of the victim's psychiatric records, the defendant also claimed that the victim's mother told him that the victim was taking psychotropic medication at the time that he allegedly assaulted her to cope with her mental illness, namely, auditory hallucinations.[2] On the basis of these claims, the defendant sought material that might document other purportedly false allegations of sexual assault and that might reveal any potential psychiatric diagnosis that the victim is "susceptible to paranoid delusions, to determine whether she is capable of distinguishing fact from fiction and whether her mental state is so significantly impaired as to render her incompetent to testify."[3]

The court first heard argument on the defendant's motion on April 13, 2005. The defendant recounted and

---

[2] We note that this allegation by the defendant was made through counsel and that the defendant never testified in this regard, nor did he sign an affidavit in support of this allegation.

[3] The defendant further claimed in his motion: "As to the mother, the defendant seeks material useful to cross-examination on the question of bias. The alleged victim apparently believes [that] her mother has failed to support her after assaults by as many as seven other men. The defendant will explore on cross-examination in this case whether the mother's testimony in this case is fueled in whole or in part by a desire to restore trust with her daughter." We know of no legal authority that would allow the examination of one person's confidential psychiatric records to impeach the testimony of another witness.

relied on the assertions in his written motion. In response, the state noted that the May 4, 1993 hospital record indicated that the victim's most recent prior hospitalization was in August, 1992, approximately ten months before the alleged assault by the defendant. Additionally, the state asserted, the same hospital record indicated that the victim was not on any medication other than birth control pills at the time of the alleged incident. Our review of the record reveals that there was no evidence adduced that the victim was on psychotropic medication in May, 1993, or at any other relevant time. Nevertheless, the defendant maintained that "a child who had twice been suicidal in the months and years preceding this [incident] and whose mother was on her way to the pharmacy and whose mother has told her lover, at that point [the defendant], that the child was taking serious psychiatric medicine, raises enough of a question in our mind to request that the court view the records to determine whether there was a psychotropic medication that may reflect a serious cognitive disability." Following argument, the court requested copies of the disclosures relied on by the defendant and reserved decision on the defendant's motion.

When court reconvened on April 19, 2005, the court ruled that the defendant had failed to make the preliminary showing warranting an in camera review of the victim's psychiatric records but indicated that the defendant could further pursue his request once the victim had testified.

Following the victim's testimony on direct examination, the defendant questioned her outside the presence of the jury in an effort to adduce a factual basis to support his motion for disclosure of her psychiatric records. The victim testified that she had been sexually assaulted prior to the incident involving the defendant and that, as a result, she had been suicidal from time

to time and, as a result, had been hospitalized two times prior to May, 1993. The victim stated that she had been on medication in relation to these hospitalizations but that she was not on medication at the time of the incident involving the defendant or at the time of trial. The victim further acknowledged that she attempted to commit suicide a couple of times and that she "heard voices" after the incident involving the defendant.[4] The court found that the defendant failed to meet the threshold requirement that the requested records would produce material relevant to the victim's testimonial capacity and, accordingly, denied the defendant's motion for disclosure or for an in camera review of the victim's psychiatric records.

"It is well settled in this state that before a criminal defendant may obtain an in camera inspection of a witness' confidential records for purposes of impeachment, he or she must first demonstrate that there is reasonable ground to believe that the failure to produce the information is likely to impair the defendant's right of confrontation such that the witness' direct testimony should be stricken. *State* v. *Bruno*, 236 Conn. 514, 522–23, 673 A.2d 1117 (1996); see also *State* v. *Castonguay*, 218 Conn. 486, 505, 590 A.2d 901 (1991) ([p]ursuant to our decisions in [*State* v. *Bruno*, 197 Conn. 326, 497 A.2d 758 (1985), cert. denied, 475 U.S. 1119, 106 S. Ct. 1635, 90 L. Ed. 2d 181 (1986), and *State* v. *Esposito*, 192 Conn. 166, 471 A.2d 949 (1984)], a defendant seeking access to privileged records that he believes contain information that would allow him to impeach a witness' ability to comprehend, know or correctly relate the truth, must make a preliminary showing that there is a

[4] Although the victim acknowledged, during this preliminary voir dire, hearing voices at one point shortly after the incident involving the defendant, she responded negatively when asked on cross-examination if she was medicated for auditory hallucinations. It is unclear whether the victim was denying being medicated for hearing voices or denying actually hearing them, and the defendant did not explore this issue further.

reasonable ground to believe that the failure to produce the records would likely impair his right to impeach the witness . . . . The defendant's offer of proof should be specific and should set forth the issue in the case to which the [confidential] information sought will relate." (Internal quotation marks omitted.) *State* v. *George J.*, 280 Conn. 551, 599, 910 A.2d 931 (2006), cert. denied, 549 U.S. 1326, 127 S. Ct. 1919, 167 L. Ed. 2d 573 (2007). "In evaluating the sufficiency of the petitioner's offer, what is pertinent is the existence of a mental issue that may have affected [the witness'] testimonial capacity, not her general character, her intelligence or the fact that she was at times inconsistent in her testimony. . . . [A] history of mental illness does not automatically impugn a witness' ability to testify truthfully and to relay events accurately. Moreover, the existence of a psychiatric disorder does not automatically [make] a witness fair game for disclosure of psychiatric records to a criminal defendant." (Citations omitted; internal quotation marks omitted.) *Ortiz* v. *Commissioner of Correction*, 91 Conn. App. 484, 490, 881 A.2d 514, cert. denied, 276 Conn. 917, 888 A.2d 85 (2005). "[T]he linchpin of the determination of the defendant's access to the records is whether they sufficiently disclose material especially probative of the [witness'] ability to comprehend, know and correctly relate the truth . . . so as to justify breach of their confidentiality and disclosing them to the defendant in order to protect his right of confrontation." (Internal quotation marks omitted.) *State* v. *Peeler*, 271 Conn. 338, 381, 857 A.2d 808 (2004), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005).

Our Supreme Court has set forth the relevant standard of review: "We review a court's conclusion that a defendant has failed to make a threshold showing of entitlement to an in camera review of statutorily protected records . . . under the abuse of discretion standard. . . . We must make every reasonable

presumption in favor of the trial court's action. . . . The trial court's exercise of its discretion will be reversed only where the abuse of discretion is manifest or where injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *George J.*, supra, 280 Conn. 599–600.

"[U]nder our case law, there are two points at which a witness' possible mental unsoundness is relevant: at or around the time of trial or of the incident about which he is to testify." (Internal quotation marks omitted.) *State* v. *Herring*, 210 Conn. 78, 109, 554 A.2d 686, cert. denied, 492 U.S. 912, 109 S. Ct. 3230, 106 L. Ed. 2d 579 (1989). In *State* v. *Burak*, 201 Conn. 517, 518 A.2d 639 (1986), the defendant petitioned the trial court for review of a key witness' privileged psychiatric records. During his offer of proof, the defendant offered evidence that the witness had received psychiatric treatment from approximately 1974 to 1975. Id., 521. The crime occurred in 1979 and the trial took place sometime thereafter. Our Supreme Court held: "[T]he defendant did not make the necessary preliminary showing that failure to produce the records was likely to impair his confrontation rights. . . . No showing was made that the witness had a mental problem which affected his testimonial capacity at the time of the occurrence of the events in this case or at the time of the trial. . . . The only facts revealed during the defendant's offer of proof on this issue were that the witness had received treatment from approximately 1974 to 1975. . . . This testimony did not indicate any inability on the part of the witness to recall or recount the events relating to the circumstances of [the victim's] death [in 1979]. . . . The defendant would apparently have us hold that the records of anyone who has ever received psychiatric treatment, for whatever purpose, are fair game for disclosure; this we decline to do." (Citations omitted.) Id., 524–25.

Similarly, in *State* v. *Rosado*, 52 Conn. App. 408, 419, 726 A.2d 1177 (1999), this court affirmed the trial court's refusal to conduct an in camera review of the victim's psychiatric records where the crime occurred in 1991 and the trial took place in 1992, but the only evidence provided by the defendant was his testimony that the victim received treatment at some time during their relationship that ended in 1989. The court stated that the absence of any evidence that the records were contemporaneous with the date of the crime or trial was fatal to his request for disclosure or an in camera review. Id., 419–20.

Here, in seeking the victim's confidential records for the fifteen year period of 1990 to 2005, the defendant relied on the fact that the victim was hospitalized twice prior to the incident involving the defendant, the most recent incident being ten months prior to the alleged incident, and at some unknown time after the incident.[5] In seeking these records, the defendant failed to show that any of the alleged mental health issues of the victim were contemporaneous with the date of the assault or the trial in this matter.

Additionally, despite the defendant's incredulity at the victim's other claims of sexual assault, the defendant did not present any evidence that these assaults did not occur. The defendant proved no more than that the victim was hospitalized for psychiatric treatment after she claimed to have been assaulted, a fact that casts no doubt on the validity of her claims.[6] In his offer of proof, the defendant did not offer the testimony of

---

[5] Notably, the state indicated that it would secure a consent from the victim for the 1992-1993 time period if that would satisfy the defendant.

[6] In the absence of any evidence of falsity, it is striking that the defendant was permitted to question the victim, both in the preliminary voir dire and during cross-examination before the jury, in relation to the prior sexual assaults in light of the proscriptions of the rape shield statute, General Statutes § 54-86f.

the victim's mother, who he claimed had given him information about the victim's psychiatric health, and there was no inquiry made of her, or any other family members or medical personnel, with respect to the dates, duration or reasons for the victim's psychiatric hospitalizations. See *State* v. *Esposito*, supra, 192 Conn. 180; *State* v. *Joyner*, 225 Conn. 450, 478, 625 A.2d 791 (1993). In short, the defendant was relying solely on the fact that the victim had prior and subsequent hospitalizations, suicide attempts and may, at one time, have suffered from auditory hallucinations. He made no showing, however, that the auditory hallucinations, the hospitalizations or the suicide attempts had any bearing on her ability accurately to recall and relate the incidents at issue. See *State* v. *Bruno*, supra, 236 Conn. 529 ("The defendant established only that [the witness] was a youth with emotional and attitudinal problems that made the school experience difficult for him and for school officials who dealt with him . . . . [T]he defendant fails to demonstrate how these facts might have affected [the witness'] testimonial capacity in this case." [Citation omitted.]). We note as well that the court made the observation that there was nothing in the manner of the victim's testimony either on direct or cross-examination to suggest that she had any problem recalling or narrating the events relating to the incident involving the defendant.[7]

---

[7] Although the court denied the defendant's motion for disclosure and declined to conduct an in camera review of the victim's psychiatric records, the defendant was permitted to inquire of the victim on cross-examination, and was afforded great latitude in doing so, in the presence of the jury, regarding all of the areas covered during his preliminary voir dire, including the victim's psychiatric health and claims of other sexual assaults. "Where the trial court allows significant cross-examination concerning a witness' veracity, it cannot be said that the constitutional right to confrontation is implicated. . . . Although a lack of knowledge about the credibility of a witness implicates the constitutional right of confrontation, [t]hat lack of knowledge can be ameliorated by an extensive and effective [cross-examination]." (Internal quotation marks omitted.) *State* v. *DeJesus*, 91 Conn. App. 47, 76–77, 880 A.2d 910 (2005), cert. granted on other grounds, 279 Conn. 912, 903 A.2d 658 (2006).

"While we are mindful that the defendant's task to lay a foundation as to the likely relevance of records to which he is not privy is not an easy one, we are also mindful of the witness' legitimate interest in maintaining, to the extent possible, the privacy of her confidential records." (Internal quotation marks omitted.) *State* v. *DeJesus*, 91 Conn. App. 47, 77, 880 A.2d 910 (2005), cert. granted on other grounds, 279 Conn. 912, 903 A.2d 658 (2006). Because the defendant failed to make the preliminary showing that the victim's testimonial capacity was impaired, the court did not abuse its discretion in declining to examine her psychiatric records in camera.[8]

## II

The defendant next claims that the state's DNA expert was not qualified in the area of the computers, lasers and cameras used to generate DNA profiles, and, therefore, the court improperly admitted the DNA evidence.[9] We disagree.

The following additional facts are relevant to the defendant's claim. Two days after the alleged incident, the victim gave to the police the pair of white underpants and pink shorts that she had been wearing on the day of the alleged incident. Some time thereafter, the victim gave the police the sofa cushion onto which the defendant had allegedly ejaculated. At trial, the DNA evidence indicated that an epithelial rich fraction of the

---

[8] The defendant also claims on appeal that the court improperly refused to issue an order requiring Bridgeport Hospital to produce the victim's psychiatric records. Because we conclude that the court properly refused to review those records in camera, we need not address this claim.

[9] Although the defendant cites *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997) (en banc), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998), as the appropriate standard of review for this claim, the defendant is not challenging the reasoning or methodology underlying the evidence, and he did not seek a *Porter* hearing in challenging the DNA evidence before the trial court.

stain on the victim's underpants revealed that the DNA from the stain was a mixture of which the defendant was included and the victim could not be excluded as a minor contributor. The testing on the sperm rich fraction of the stain revealed a single source for the DNA, a profile consistent with the defendant. There was additional evidence that the DNA testing, with respect to both the epithelial rich fraction and the sperm rich fraction extracted from the stain on the sofa cushion, also revealed a single source consistent with the defendant's profile.

The state offered DNA evidence through Nicholas Yang, a forensic scientist employed by the department of public safety. Yang testified as to his qualifications, including a bachelor's degree in biochemistry and a master's degree in forensic science. He was also working toward a Ph.D. in genetics at the time. Yang had completed one year of training and had been employed at the laboratory for six and one-half years and had analyzed thousands of DNA samples. Yang testified that in order to do DNA typing, analysts get "pictures of [DNA] bands, which are transformed by software into peaks, and then we make comparisons between peaks of unknown and known samples." The defendant objected to Yang's testimony, arguing that the state had failed to lay a sufficient foundation that Yang had an adequate understanding of computer generated evidence as set forth in *State* v. *Swinton*, 268 Conn. 781, 847 A.2d 921 (2004).[10] The defendant was permitted

---

[10] In *Swinton*, the defendant objected to the introduction of computer enhanced photographs of bite marks that had been left on the victim and to computer generated exhibits showing the defendant's teeth superimposed on the bite marks. Relying on rule 901 of the Federal Rules of Evidence, the court adopted six factors to be added to the requirement it had previously set forth in *American Oil Co.* v. *Valenti*, 179 Conn. 349, 359, 426 A.2d 305 (1979). In *American Oil Co.*, the court held that there must be "testimony by a person with some degree of computer expertise, who has sufficient knowledge to be examined and cross-examined about the functioning of the computer." In *Swinton*, the court adopted the additional requirements that "(1) the computer equipment is accepted in the field as standard and

358

to voir dire Yang as to his qualifications, background, training and expertise. The court admitted Yang's testimony, indicating that it had reviewed *Swinton*, and that Yang had demonstrated a degree of expertise in the computer field and had sufficient knowledge of the functioning of the computer system and program.

"In determining the relevancy and admissibility of evidence, trial courts have broad discretion. . . . Our standard of review of an evidentiary ruling is dependent on whether the claim is of constitutional magnitude. If the claim is of constitutional magnitude, the state has the burden of proving the constitutional error was harmless beyond a reasonable doubt. . . . Otherwise, in order to establish reversible error on an evidentiary impropriety, the defendant must prove both an abuse of discretion and a harm that resulted from such abuse." (Citations omitted; internal quotation marks omitted.) Id., 797–98. Because we find no error, we need not address the issue of harm.

The issue before us is whether the state laid an adequate foundation to introduce the DNA evidence by "a person with some degree of computer expertise, who has sufficient knowledge to be examined and cross-examined about the functioning of the computer." (Internal quotation marks omitted.) Id., 813. Yang testified that the DNA typing method that he used was the method that was generally accepted within the scientific community. He explained that a laser is used to

competent and was in good working order, (2) qualified computer operators were employed, (3) proper procedures were followed in connection with the input and output of information, (4) a reliable software program was utilized, (5) the equipment was programmed and operated correctly, and (6) the exhibit is properly identified as the output in question." (Internal quotation marks omitted.) *State* v. *Swinton*, supra, 268 Conn. 811–12.

In his brief, the defendant claims that the state failed to meet any of the standards enunciated under *Swinton* regarding computer generated evidence. Because the defendant, at trial, attacked only Yang's qualifications to testify, his claim that none of the *Swinton* requirements were satisfied is unpreserved.

excite a dye that is contained on the DNA strand, which causes the DNA to migrate across a gel. A camera captures the image of that migration, and those images are turned into peaks and printed out and compared with the question samples. Yang detailed a system of protocols and controls followed by the laboratory to safeguard the testing and that a second analyst reviews all of the testing methods and the data generated in each and every case. Although Yang did not create the computer software used in the DNA testing, on the basis of Yang's qualifications and familiarity with the DNA testing procedures and equipment, we conclude that the court correctly determined that he was sufficiently acquainted with the technology involved in the computer program that was used to generate the evidence in question, and, accordingly, the court did not abuse its discretion in allowing it into evidence.

The judgment is affirmed.

In this opinion the other judges concurred.