******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* RALPH B.*
(AC 35654)

Sheldon, Keller and Schaller, Js.

*Argued September 21, 2015—officially released January 26, 2016*

(Appeal from Superior Court, judicial district of

Tolland, Solomon, J. [motion to modify bond conditions; request to attend pretrial]; Kwak, J. [motion to attend pretrial; judgment].)

*Jeffrey C. Kestenband*, for the appellant (defendant).

*Brett R. Aiello*, special deputy assistant state's attorney, with whom, on the brief, were *Matthew C. Gedansky*, state's attorney, and *Nicole I. Christie*, assistant state's attorney, for the appellee (state).

*Opinion*

SCHALLER, J. The defendant, Ralph B., appeals from the judgment of conviction, rendered after a jury trial, of attempt to commit assault in the first degree in violation of General Statutes §§ 53a-49 and 53a-59 (a) (1), unlawful restraint in the first degree in violation of General Statutes § 53a-95 (a), strangulation in the second degree in violation of General Statutes § 53a-64bb (a), and risk of injury to a child in violation of General Statutes § 53-21 (a) (1). On appeal, the defendant claims: (1) his due process right to a fair trial was violated because he was not permitted to attend three pretrial hearings, which proceeded in his absence over his objection; (2) the trial court improperly permitted the state to introduce extrinsic evidence on a collateral matter; (3) the conviction of attempt to commit assault in the first degree and unlawful restraint in the first degree should be vacated because § 53a-64bb (b) does not permit someone who is convicted of strangulation in the second degree also to be convicted of assault and unlawful restraint; and (4) the trial court improperly denied him his right to allocution and to present information in mitigation of sentencing. We agree with the defendant regarding his first claim, and, therefore, reverse the judgment of the trial court.

The jury reasonably could have found the following facts. On January 4, 2012, the defendant was married to L.B. They have one child, I.B., who was three years old on January 4, 2012. On that date, following an argument regarding a possible divorce, the defendant left the home in anger and L.B. put I.B. to bed. She then went to sleep in I.B.'s room, in a bed across from his bed. The defendant returned home and entered I.B.'s room. The defendant turned on a closet light and woke L.B. The defendant then attempted to strangle L.B. with a cord, in the process waking up I.B. L.B. attempted to call 911, but the defendant threw her cell phone into the hallway. They continued to struggle and L.B. pleaded with the defendant to stop, asking him why he was upset. He responded that he had sent her several text messages to which she had not replied. The defendant permitted her to get her cell phone but, as she attempted to show him that she had not received any messages, he came at her with the cord a second time. She dialed 911 and dropped the cell phone on the floor. The defendant continued to choke her; she fought back and, after hearing I.B. call out to her, was able to wrest the cord from the defendant. She took the cord and went to check on I.B. The defendant then again attempted to strangle her with his hands. L.B. escaped and attempted to calm the defendant. When she heard cars outside, she ran downstairs with the cord in her hands. Once she was outside, she saw the police. She threw the cord to the first police officer she saw and told the police that the defendant had tried to kill her with it. The

police arrested the defendant, took a statement from L.B., and photographed her neck and face. She then went to a hospital. The defendant was arrested and charged with strangulation in the first degree, unlawful restraint in the first degree, attempt to commit assault in the first degree, interfering with an emergency call, strangulation in the second degree, and risk of injury to a child.

Following the trial, the jury found the defendant guilty of attempt to commit assault in the first degree, unlawful restraint in the first degree, strangulation in the second degree, and risk of injury to a child. It acquitted him of strangulation in the first degree and interfering with an emergency call. The court, *Kwak, J.*, sentenced the defendant to twenty years incarceration followed by five years of special parole. This appeal followed.

The defendant claims that his due process rights were violated when the court did not permit him to attend three hearings on pretrial motions. The defendant argues that these hearings were critical stages of the proceedings and that he was entitled to be present. He argues that his presence bore a reasonably substantial relationship to the fullness of his opportunity to defend against the charges and that the hearings were not fair and just in his absence. The state responds that the defendant did not make an adequate showing that his absence from the hearings adversely affected his opportunity to defend against the charges. We first set forth our standard of review. "Whether the defendant's constitutional rights were violated by his exclusion from [a] hearing presents a question of law and, accordingly, we exercise plenary review." *State* v. *Dixon*, 318 Conn. 495, 511, 122 A.3d 542 (2015).

The following additional facts are necessary for our consideration of the defendant's claims. On January 4, 2013, the court, *Solomon, J.*, held a hearing regarding the conditions of the defendant's bond. The defendant was not incarcerated; he was on house arrest with a global positioning system (GPS) monitor, which a probation officer monitored. At the conclusion of the hearing before Judge Solomon, the defendant requested a hearing on his motions regarding a bill of particulars, a request for essential facts, and a motion to dismiss regarding discovery issues. The court confirmed that, as these were discovery issues, they would take only a few minutes. The court then scheduled a hearing for January 7, 2013, before the trial court, *Kwak, J.* The defendant's attorney asked if the defendant could attend. The court ruled that the defendant did not need to be present, as the motions involved only legal issues pertaining to discovery, and denied the request.[1]

On January 7, 2013, the defendant's attorney filed a "motion for client to be present in court for all hearings and proceedings in connection with this case." The

defendant asserted that there were thirteen outstanding motions, including, in addition to those discussed before Judge Solomon, a motion in limine to exclude prior convictions, a motion to require notice of uncharged misconduct evidence, and a motion for in camera review of records of the complaining witness, L.B.[2] The motion for the defendant to be present cited the applicable law, and claimed that some of the motions could require the defendant's testimony and the testimony of the defendant's expert witness. The defendant's attorney further claimed that communication between a client and counsel during the hearing was key to effective assistance of counsel and a working attorney-client relationship. Finally, the defendant's attorney asserted that the interests of transparency in the judicial process required the defendant to be present in the courtroom when thirteen substantive motions were decided.

In the hearing on January 7, 2013, before Judge Kwak, the defendant's attorney renewed the motion to permit the defendant to be present. The court asked whether Judge Solomon initially had denied the request. The defendant's attorney answered that Judge Solomon had denied the request, but without the benefit of the legal authority that the defendant provided in the memorandum.[3] The defendant's attorney emphasized that the pending motions were substantive and could require the defendant to testify. The state responded that it could not disagree with the defendant's presence at the critical portions of some of the motions, and suggested that the parties select which motions they could address that day and which would require a later hearing. The court ruled that it would need to look at the file before deciding whether to permit the defendant to be present, but that there were some matters it could consider without the defendant being present. Following discussion of the status of various discovery requests, the court granted the defendant's motion for a bill of particulars, ordered the state to provide a witness list, denied the defendant's motion to dismiss, denied the defendant's motion for a continuance, declined to grant the defendant's motion to require notice of any uncharged misconduct evidence because the state voluntarily agreed to provide notice, and denied the defendant's request to make an opening statement.

The defendant's attorney then argued that the motion for an in camera review of records of L.B. would require the defendant's presence and possible testimony. The defendant's attorney asserted that there were other motions requiring the defendant's presence. The state also requested that the defendant's attorney confirm that he would not be relying on an alibi defense and did not intend to rely upon the defenses of mental disease or defect or extreme emotional disturbance. The court scheduled a subsequent hearing for January 15, 2013.

On January 9, 2013, the trial court denied the defendant's January 6, 2013 motion to be present. The court did not provide any reasons for its ruling at that time.[4]

On January 15, 2013, the court held the scheduled hearing in the absence of the defendant.[5] The court first addressed the defendant's motion for an in camera review of the records of L.B. In support of this motion, the defendant's attorney elicited the testimony of Erin Nicole Haataja, a longtime acquaintance of the defendant and L.B. Haataja testified that in the past, L.B. had claimed that the defendant had scratched her with a screwdriver when in fact Haataja had seen L.B. scratching herself. Haataja also testified that, on one occasion, L.B. had dropped a cooler onto herself, then claimed the defendant had pushed the cooler onto her. The defendant's attorney asserted that Haataja's testimony showed that there was a reasonable possibility that L.B. had a mental condition affecting her ability to comprehend, know, or correctly relate the truth, pursuant to *State* v. *Blake*, 106 Conn. App. 345, 352, 942 A.2d 496, cert. denied, 287 Conn. 922, 951 A.2d 573 (2008),[6] and requested that the court conduct an in camera review of L.B.'s mental health records in order to determine whether they contained any potential impeachment material. The court denied the defendant's motion.

The court declined to rule on the defendant's motion to suppress until the time of trial, granted the defendant's motion to reserve the right to file supplemental motions, and ruled on the defendant's motion in limine to exclude prior convictions, stating that any felonies allowed by the rules of evidence would not be excluded. The state confirmed that the only prior convictions were from 2008 and 2006 and that it did not intend to introduce them into evidence unless the door was opened to their admission. The state had filed a notice of the uncharged misconduct evidence it intended to submit; the court ordered that the state would provide notice if it discovered anything else. The defendant's attorney asked that the court wait before considering the state's motion in limine and motion for uncharged misconduct so that he could file a brief in response.

At the start of the third hearing, on February 1, 2013, the defendant's attorney again objected to the defendant's not being present, asserting that the hearing was a critical stage of the defendant's criminal prosecution. The court responded: "Well, that matter's been already decided. Judge Solomon already denied that motion. I've also denied it. It's not critical for him to be here today. It's a hearing. He's not going to be confronting any of his witnesses or anything like that. So, that's been ruled upon already . . . ." The court then considered the defendant's motion to suppress the testimony of Maggie Nardelli, a Department of Children and Families worker, regarding statements the defendant made

to her during her investigation on behalf of the department. The court ruled that it would permit the defendant to question Nardelli outside the presence of the jury prior to her testimony so that the court could determine whether the defendant thought he was talking to a law enforcement officer and whether the defendant's statements to her were made voluntarily. The parties then argued whether the defendant could present evidence of L.B.'s arrest for disorderly conduct, which he had witnessed, and whether the state could then offer evidence of the defendant's own involvement in the incident. The court ruled that evidence of both parties' involvement could come in. The court also ruled that, on cross-examination of L.B., the defendant could question her regarding her therapy sessions in order to determine whether there was anything in her medical records that might require in camera review.

The parties then addressed the motion pertaining to the admissibility of the defendant's prior uncharged misconduct. The court determined that one instance, when the defendant allegedly yelled a racial epithet at a worker who had come to fix his GPS monitor, should not be admitted. Regarding seven other alleged events of uncharged misconduct, the defendant's attorney argued that the events were too dissimilar to the crimes alleged and too remote in time to have significant probative value, and would be highly prejudicial. The state argued that the prior incidents of alleged violence directed against L.B. showed that the defendant engaged in a common scheme of using violence when L.B. disagreed with him. The court ruled that it would admit six uncharged misconduct incidents to show intent, motive, absence of mistake and to establish a common plan or scheme. It then turned to the state's request that it be permitted to introduce the testimony of Nicole Tremblay, the defendant's former girlfriend, that the defendant had abused her during their relationship. The court ruled that Tremblay's testimony was irrelevant and would be too prejudicial, but that if the defendant opened the door to its admission, "then we'll see where it goes from there."[7] The parties concluded with a preliminary discussion on the record of the jury instructions, including discussing the manner in which the judge would provide limiting instructions for the prior uncharged misconduct evidence.

After this appeal was filed, the defendant filed a motion for articulation, which the court granted. The motion for articulation asked: "When the trial court (*Kwak, J.*) ruled that the defendant would not be permitted to attend certain pretrial hearings, was the court adopting Judge Solomon's rationale at the hearing on January 4, 2013? If not, on what basis did the court go forward with the hearings in the defendant's absence?" The court ruled that it "adopted Judge Solomon's order and its rationale under the law of the case doctrine." It further ruled: "This court was of the opinion that the

issue was correctly decided by Judge Solomon. There was no new or overriding circumstance that warranted vacating, modifying or departing from Judge Solomon's ruling.''

The defendant claims that his due process rights were violated when Judges Kwak and Solomon did not permit him to be present during the three hearings on pretrial motions. The defendant claims that these hearings were critical stages of the proceedings, and that his presence would have contributed to the fairness of the procedure. The defendant contends that neither Judge Solomon nor Judge Kwak applied the correct legal test; specifically, the defendant asserts that even if the motions concerned legal matters only, his right to be present would apply to any critical stage in the proceedings that bore a reasonably substantial relationship to the fullness of his opportunity to defend against the charges. As two examples of how the defendant's presence could have affected his ability to defend against the charges, the defendant argues that he could have provided testimony in support of his motion for an in camera review of L.B.'s mental health records, and that he would have known that he should not open the door to the admission of Tremblay's testimony. The defendant also maintains that, had he been present, he would have better understood the process he was going through and would have been able to more fully participate in his own defense.

The state responds that the defendant did not make an adequate showing that his absence from the hearings adversely affected his opportunity to defend against the charges. It argues that the defendant did not demonstrate what he could have added to the court's determination of whether to engage in an in camera review of L.B.'s mental health records. It argues that the defendant should have made an offer of proof as to what his testimony would have been. It also asserts that the defendant's attorney could have relayed the judge's holding regarding Tremblay to the defendant, cautioning him to be wary of opening the door to the introduction of her testimony.

''It is undisputed that a defendant has a constitutional right to be present at all critical stages of the trial. . . . The constitutional right to presence is rooted to a large extent in the [c]onfrontation [c]lause of the [s]ixth [a]mendment . . . but . . . [that] right is protected by the [d]ue [p]rocess [c]lause in some situations where the defendant is not actually confronting witnesses or evidence against him. . . . In judging whether a particular segment of a criminal proceeding constitutes a critical stage of a defendant's prosecution, courts have evaluated the extent to which a fair and just hearing would be thwarted by [the defendant's] absence or whether his presence has a relation, reasonably substantial, to the [fullness] of his opportunity to defend

against the charge. . . . Thus, a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure. *Kentucky* v. *Stincer*, 482 U.S. 730, 745, 107 S. Ct. 2658, 96 L. Ed. 2d 631 (1987)." (Citations omitted; internal quotation marks omitted.) *State* v. *Dixon*, supra, 318 Conn. 511–12; *State* v. *Lopez*, 271 Conn. 724, 732, 859 A.2d 898 (2004).

"Although some courts have held that a defendant has a right to be present even when questions of law are discussed . . . the better view would seem to be that there is no such absolute right . . . especially when, as in the present case, the question of law is argued prior to the selection of the jury and the commencement of trial. . . . The question should be whether the defendant's presence bears a relation, reasonably substantial, to his opportunity to defend." (Citations omitted; internal quotation marks omitted.) *State* v. *Olds*, 171 Conn. 395, 405–406, 370 A.2d 969 (1976). "[T]he exclusion of a defendant from a proceeding should be considered in light of the whole record." *State* v. *McNellis*, 15 Conn. App. 416, 432, 546 A.2d 292, cert. denied, 209 Conn. 809, 548 A.2d 441 (1988).

Although there is no Connecticut case entirely on point with the present case, *State* v. *Olds*, supra, 171 Conn. 405–406, is the most factually similar. In that case, the trial court denied the defendant's request to be brought into court for a pretrial motions hearing, which included motions to quash, for production, for trial by a jury of twelve, and to reduce bond. Id., 405. The defendant's attorney did not advance a cogent reason why he had a right to be present. Id. Our Supreme Court ruled that, where a question of law is argued prior to the selection of the jury and the commencement of trial, "[t]he question should be whether the defendant's presence bears a relation, reasonably substantial, to his opportunity to defend." (Internal quotation marks omitted.) Id., 406. Our Supreme Court determined that, "on the record before [it], there would have been no advantage to having the defendant present when the motions in question were discussed." (Internal quotation marks omitted.) Id.

In *State* v. *Reyes*, 19 Conn. App. 695, 564 A.2d 309, cert. denied, 213 Conn. 803, 567 A.2d 833 (1989), this court determined that the defendant should have been permitted, pursuant to then Practice Book §§ 967 and 968, to attend a hearing during the course of trial, even though the issues were entirely legal.[8] This court determined that "the defendant's enforced absence bore a reasonably substantial relation to his opportunity to defend himself because he was precluded from hearing the court's remarks reflecting upon his counsel's preparation of his case." Id., 700. It determined that the error was harmless because the issue of attorney competence

was more appropriate for a habeas petition. Id., 701.

The issue presented in *Olds* is remarkably similar to the issue presented to Judge Solomon on January 4, 2013. At the hearing before Judge Solomon, the defendant stated that the motions to be argued at the January 7, 2013 hearing were a bill of particulars, a request for essential facts, and a motion to dismiss regarding discovery issues. The defendant's attorney did not explain why the defendant should be permitted to attend, aside from stating that he liked to be in court. Judge Solomon ruled that because only legal issues would be argued, the defendant had no right to attend. Although the court should have determined expressly whether the hearing was critical and whether the defendant's presence bore a reasonably substantial relation to his opportunity to defend himself, we conclude that the hearing was not critical and did not bear a reasonably substantial relationship to his opportunity to defend himself. See *State* v. *Olds*, supra, 171 Conn. 405–406.

When the issue again was raised before Judge Kwak on January 7, 2013, however, the defendant's attorney had asserted in his memorandum of law that he intended to argue several additional motions, and the defendant provided justification for his presence. These motions dealt with factual issues within the defendant's knowledge, such as his own prior uncharged misconduct, the criminal record of L.B. concerning conduct that he had witnessed, and his observations regarding L.B.'s mental state. In addition, the prosecutor acknowledged that some of the motions were in fact critical and conceded that she did not object to the defendant's being present, subject to whatever monitoring was appropriate.[9] Judge Kwak properly decided the motions that the parties agreed could be decided outside the defendant's presence. The court ruled that it would consider whether the defendant had a right to be present at later hearings with respect to the remaining motions.

We now turn to Judge Kwak's decision that the defendant did not have a right to be present at the two subsequent hearings, on January 15, 2013, and February 1, 2013. At the January 15, 2013 hearing, the defendant argued his motion for in camera review of L.B.'s mental health records. The defendant asserts that he could have provided additional testimony regarding L.B.'s mental health that could have affected the court's determination regarding whether in camera review was warranted. The defendant had stated in his motion to be present that some of the motions might require his testimony, but his attorney did not state at the hearing that this was a motion that required testimony, nor did he make a proffer of what the defendant's testimony would have been.

This hearing was a critical stage in the proceedings.

The case amounted to a credibility contest between the defendant and L.B. They were the only two witnesses to the altercation who testified. Whether L.B. had any mental health issues impacting her ability to recall events or to be truthful was a key concern.

In addition, the defendant could have made a meaningful contribution to the proceedings. He knew the witness who did testify, Haataja, and, therefore, may have aided his attorney's questioning of her. In addition, he may have been asked to provide additional testimony regarding incidents wherein L.B. exhibited a tendency to fabricate untruths or to harm herself. The state contends that, without a proffer of the defendant's testimony, we cannot determine whether he would have contributed meaningfully to his own defense.[10] Although we cannot determine the precise nature of the defendant's contribution, the considerations previously discussed demonstrate that his presence bore a reasonably substantial relationship to his opportunity to defend himself. See id. We therefore find that the defendant's due process right to be present at the January 15, 2013 hearing was violated.

We next turn to the hearing on February 1, 2013. At the start of this hearing, the defendant's attorney reiterated his request that the defendant be present. This hearing concerned a number of substantive motions, including the defendant's motion to suppress a statement that he had made to Nardelli, the state's motion to admit evidence of uncharged misconduct, and cross motions by the state to permit Tremblay's testimony and by the defendant's attorney to preclude Tremblay from testifying because of late discovery. In assessing whether this hearing was critical to the defendant's defense, we assess the potential impact of these pieces of evidence on the defendant's case on the basis of the defendant's attorney's statements at the February 1, 2013 hearing, and the statements in the motions regarding the anticipated evidence.

The importance of the evidence discussed at this hearing demonstrates that it was a critical stage of the case. The content of Nardelli's anticipated testimony was not discussed at the hearing or in the motion to suppress, but the suppression of statements made by the defendant is often an important consideration.[11] More importantly, the admission of the defendant's uncharged misconduct, consisting of violence and threats of violence directed against L.B., potentially would have a significant effect on the jury's view of him. Finally, Tremblay's testimony regarding prior abuse by the defendant directed against her could provide strong corroboration for the state's case. This hearing was critical to the defendant's defense.

Although the defendant has not claimed that he would have testified in support of any of the motions argued on February 1, 2013, many concerned his own actions

and statements. He could have aided in his defense by suggesting arguments to his attorney or disputing the characterization of his actions by the state. The key issue regarding his uncharged misconduct was how similar it was to the conduct in the present case. He could have helped his attorney to formulate arguments regarding how the various incidents of misconduct were different, or to correct mischaracterizations by the state. See *People* v. *Dokes*, 79 N.Y.2d 656, 595 N.E.2d 836, 584 N.Y.S.2d 761 (1992).[12] Finally, had the defendant been present at the hearing, he may have better understood the importance of preventing Tremblay's testimony from being admitted. This may have encouraged the defendant to testify in a more guarded manner. His presence could have contributed to the fairness of the procedure. His absence bore a reasonably substantial relationship to his opportunity to defend himself.

Having determined that the defendant's right to due process was violated, we now turn to whether the defendant's absence should be considered an instance of structural error or whether it is subject to a harmless error analysis. The defendant asserts, citing *State* v. *Lopez*, supra, 271 Conn. 726, that when the defendant is denied his right to be present, the error is structural in nature and not subject to harmless error analysis. In the alternative, the defendant contends that the court's error clearly was not harmless. The state responds that *Lopez* is distinguishable on its facts, and that any error was harmless because the defendant failed to demonstrate what he could have done differently had he been present at the hearings. We agree that *Lopez* is distinguishable, but conclude that the error was not harmless.

"A determination that the defendant's absence from a critical stage of the proceedings violated his constitutional rights does not end the inquiry that a reviewing court must conduct in deciding whether to order a new trial." Id., 732. "Although the United States Supreme Court has noted that most constitutional errors are subject to a harmless error analysis . . . the Supreme Court has recognized . . . that, when the consequences of the deprivation of the defendant's constitutional right are necessarily unquantifiable and indeterminate, [the deprivation of that right] unquestionably qualifies as structural error." (Citation omitted; internal quotation marks omitted.) Id., 737–38. "Structural [error] cases defy analysis by harmless error standards because the entire conduct of the trial, from beginning to end, is obviously affected . . . ." (Internal quotation marks omitted.) Id., 733. "A structural error creates a defect in the trial mechanism such that, while it is virtually impossible to pinpoint the exact harm, it remains abundantly clear that the trial process was flawed significantly. For this reason, [e]rrors of this magnitude are per se prejudicial and require that the underlying conviction be vacated." (Emphasis omitted; internal quotation marks omitted.) Id., 739. Our

Supreme Court "has found error to be structural only when the error renders a trial fundamentally unfair and is not susceptible to a harmless error analysis . . . ." (Internal quotation marks omitted.) *State* v. *Brown*, 279 Conn. 493, 509–10, 903 A.2d 169 (2006).

Our Supreme Court in *Lopez* held that where a criminal defendant is denied knowledge of a potential conflict of interest of his attorney, it is impossible to say how the subsequent proceedings have been affected. *State* v. *Lopez*, supra, 271 Conn. 736. "[T]he potential conflict centered around the pivotal witness against the defendant—the victim—and the critical issue at trial—the victim's credibility. It is impossible to know, had the defendant been present, whether he would have initiated further inquiry into the conflict, requested new counsel or requested that [the defendant's attorney] testify on the defendant's behalf. . . . Thus, the consequences of the deprivation of the defendant's right to be present in this case are necessarily unquantifiable and indeterminate, and the deprivation of that right unquestionably qualifies as structural error." (Citation omitted; emphasis omitted; internal quotation marks omitted.) Id., 738. Here, in contrast, the motion hearings concerned specific evidence that the defendant claims might not have been admitted, or would have been admitted, if he had been present. The effects of the error are quantifiable and determinate. Accordingly, we apply a harmless error analysis.

The defendant argues that, in general, his absence compromised his ability to defend against the charges. The defendant again focuses on his inability to testify in support of his motion for in camera review of L.B.'s mental health records, and his inability to hear the court's orders regarding Tremblay's testimony and the opening the door doctrine. He also contends that the interest in transparency of court proceedings and the intangible assistance the defendant could have provided to his attorney demonstrate that the error was not harmless. The state responds that the defendant has not provided evidence of what his testimony would have been if he had been present to testify in support of his motion for in camera review.[13] It further argues that the defendant's attorney should have discussed the opening the door doctrine with him, and that, therefore, his rights were protected.

"[T]he United States Supreme Court has repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Brown*, supra, 279 Conn. 504. "[T]he state bears the burden of proving that the constitutional impropriety was harmless beyond a reasonable doubt." Id., 511. In evaluating whether a denial of presence is harmless, "[w]e first

determine whether the defendant's presence . . . would have contributed to his ability to defend against the charges. . . . We then consider the evidence presented at trial." (Citation omitted.) *State* v. *Zapata*, 119 Conn. App. 660, 685, 989 A.2d 626, cert. denied, 296 Conn. 906, 992 A.2d 1136 (2010), overruled in part on other grounds by *State* v. *Dixon*, 318 Conn. 495, 509 n.4, 122 A.3d 542 (2015).[14]

Although the state asserts that any error was harmless because the defendant's counsel did not proffer the defendant's testimony in support of his motion for in camera review, we note that the state bears the burden of proving harmlessness. On the basis of our review of the record, we conclude that the state has not proven that the absence of the defendant was harmless beyond a reasonable doubt. The lack of L.B.'s mental health records, the admission of the defendant's prior misconduct, and the lack of an opportunity for the defendant to hear the discussion regarding Tremblay's testimony all could have affected the outcome of this case.[15] L.B. was the only witness to the altercation at issue to testify against the defendant. Her testimony was corroborated by the 911 tape, on which the state claims that L.B. and I.B. can be heard, and her physical injuries were corroborated by the testimony of the police and the medical experts who examined her.[16] Still, L.B.'s testimony regarding prior uncharged misconduct may have been crucial in convincing the jury of the defendant's guilt beyond a reasonable doubt. L.B.'s testimony regarding the defendant's prior violence toward her made this incident the latest in a string of incidents, and suggested that the defendant made a practice of using physical force to intimidate. Tremblay's testimony, admitted after the defendant had opened the door to it by saying he did not punch people, provided the linchpin in this characterization of the defendant because it provided independent corroboration of the defendant's pattern of abusive behavior. Had none of these bad acts been admitted, or even if fewer of them had been admitted, the result of the trial could have been different. Finally, if L.B.'s mental health records did indeed contain corroboration for the defendant's theory that she had a propensity for fabrication, the state's case would have been weakened further. The state has not met its burden of showing that the court's error in denying the defendant the right to be present at the January 15, 2013 and February 1, 2013 hearings was harmless beyond a reasonable doubt.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.

* In accordance with our policy of protecting the privacy interests of the victims of the crime of risk of injury to a child, we decline to use the defendant's full name or to identify the minor victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[1] The following colloquy occurred between the court and the defendant's counsel regarding the request that the defendant be allowed to attend the

motions hearing:

"[The Defendant's Attorney]: . . . Your Honor, on an administrative note, can he come to court on Monday morning here?

"The Court: Is she going to be here? Oh. You—why does he need to be here? It's a discovery motion.

"[The Defendant's Attorney]: Well, I mean, I like—he likes to be in court to hear what—

"The Court: I'm sure he'd rather be anywhere than at home. No, you can't be here on Monday. It's—

"[The Defendant's Attorney]: Okay.

"The Court: —a legal matter only."

[2] The motions listed in the defendant's motion were: a request for disclosure, a motion for bill of particulars, a motion for preservation and production of materials related to radio and telephone communications, a motion to suppress, a motion to reserve the right to file supplemental motions, a request for essential facts, a request for names of witnesses and prior records of witnesses, a motion to require notice of uncharged misconduct evidence, a motion in limine to exclude prior convictions, a request to make an opening statement, a claim for the motions docket and a motion for argument on motions, a motion for in camera review of records of L.B., and a motion to dismiss all charges against the defendant.

[3] The defendant's attorney did not argue that the basis of Judge Solomon's decision had been that the motions were discovery motions. All of the motions had been filed previously (July 31, 2012, August 1, 2012, October 24, 2012, and January 1, 2013); before Judge Solomon, the defendant's attorney referenced only discovery motions. In his motion and before Judge Kwak, the defendant's attorney discussed all the motions and emphasized the substantive ones. Moreover, several key motions were filed after the January 7, 2013 hearing, including, on January 14, 2013, the state's notice of uncharged misconduct regarding eight incidents, and on January 30, 2013, the state's notice of uncharged misconduct related to Tremblay.

[4] The court did articulate its decision later; we will discuss the articulation in this opinion.

[5] As part of his appeal, the defendant filed a motion for review requesting that the trial court hold an evidentiary hearing to determine whether he was present in court for the pretrial hearing on January 15, 2013, which this court granted. The hearing was held on June 18, 2014; the trial court found that the defendant had not been present at the January 15, 2013 hearing.

[6] "[A] history of mental illness does not automatically impugn a witness' ability to testify truthfully and to relay events accurately. Moreover, the existence of a psychiatric disorder does not automatically [make] a witness fair game for disclosure of psychiatric records to a criminal defendant. . . . [T]he linchpin of the determination of the defendant's access to the records is whether they sufficiently disclose material especially probative of the [witness'] ability to comprehend, know and correctly relate the truth . . . so as to justify breach of their confidentiality and disclosing them to the defendant in order to protect his right of confrontation." (Citation omitted; internal quotation marks omitted.) *State* v. *Blake*, supra, 106 Conn. App. 352.

[7] During the course of the trial, the court determined that the defendant had opened the door to testimony by Tremblay when he stated that he did not normally punch people. It permitted the state to first question the defendant about Tremblay, and then call and question her regarding the defendant's having hit her.

[8] The current corollaries to Practice Book §§ 967 and 968 are §§ 44-7 and 44-8, respectively, which have not been raised in the present case.

[9] Despite these changed circumstances, Judge Kwak stated in his articulation that the law of the case doctrine justified his decision. We conclude that, the underlying circumstances being different, Judge Kwak was incorrect to apply the law of the case doctrine. "The law of the case doctrine expresses the practice of judges generally to refuse to reopen what [already] has been decided . . . . New pleadings intended to raise again a question of law which has been already presented on the record and determined adversely to the pleader are not to be favored. . . . [When] a matter has previously been ruled [on] interlocutorily, the court in a subsequent proceeding in the case may treat that decision as the law of the case, if it is of the opinion that the issue was correctly decided, in the absence of some new or overriding circumstance." (Internal quotation marks omitted.) *Total Recycling Services of Connecticut, Inc.* v. *Connecticut Oil Recycling Services, LLC*, 308 Conn. 312, 322, 63 A.3d 896 (2013); id., 323 (trial court improperly applied law of

the case doctrine where defendants presented new evidence and new legal analysis in support of their claim); see also *Johnson* v. *Atkinson*, 283 Conn. 243, 250, 926 A.2d 656 (2007) (where facts were contested when prior judge decided issue, subsequent judge did not err when deciding issue differently based on stipulated facts), overruled in part on other grounds by *Jaiguay* v. *Vasquez*, 287 Conn. 323, 348, 948 A.2d 955 (2008).

[10] The defendant cites to his attorney's testimony at the hearing on his motion for review. See footnote 5 of this opinion. In addition to testifying that the defendant had been absent on January 15, 2013, the defendant's attorney also testified regarding the assistance the defendant could have provided had he been present. The court cut this testimony short following the state's objection, as it was beyond the scope of the hearing. Therefore, the defendant's attorney was not subject to cross-examination. The trial court stated that it did not give much weight to the inferences the defendant asked the court to make. The trial court's only holding was that the defendant had not been present on January 15, 2013. Therefore, we cannot consider that testimony as evidence that was properly before the trial court, but only as an argument by counsel.

[11] The court ruled that it would hear Nardelli's testimony outside of the jury's presence, then determine whether the defendant thought she was a member of law enforcement and whether he had made statements to her voluntarily. Although this outcome was in the defendant's favor, the potential impact of Nardelli's testimony provides weight to the importance of the hearing. Prior to Nardelli's trial testimony, the court ruled that she could testify regarding the defendant's statements because he was a party opponent. She did not testify outside the presence of the jury, and the court did not rule on the issues of whether the defendant had perceived her to be a member of law enforcement, or whether he spoke to her voluntarily. In her testimony, she recounted contradictory statements made by the defendant regarding the incident.

[12] "Given the number of factors that are relevant to the court's decision, the potential for meaningful participation by the defendant during the determination of the merits of a [hearing regarding whether uncharged misconduct is admissible] is apparent. For example, the defendant is in the best position to point out errors in [his arrest record], to controvert assertions by the prosecutor with respect to uncharged acts and to provide counsel with details about the underlying facts of both charged and uncharged acts. In short, the defendant's presence will help to ensure that the court's determination will not be predicated on the prosecutor's unrebutted view of the facts . . . . The importance of the defendant's ability to participate in this proceeding is compounded by the significance of the court's determination. The court's ruling on the permissible scope of cross-examination about prior bad acts is often the pivotal factor in the defendant's determination whether to testify." (Citation omitted; footnote omitted; internal quotation marks omitted.) *People* v. *Dokes*, supra, 79 N.Y.2d 661–62.

[13] We are skeptical as to the mechanism by which the defendant's attorney could have proffered the defendant's testimony. The defendant was not present in court, and the court had at that point already denied his motion to be present.

[14] The Supreme Court in *State* v. *Dixon*, supra, 318 Conn. 509 n.4, overturned this court's determination in *State* v. *Zapata*, supra, 119 Conn. App. 685, that an in-chambers hearing on potential juror bias was a critical stage of the proceedings, to the extent that the two were in conflict. The Supreme Court did not overturn the *Zapata* court's harmless error analysis.

[15] As stated in footnote 11 of this opinion, Judge Kwak did not rule on the admissibility of Nardelli's testimony until trial. At trial, despite his statement at the February 1, 2013 hearing, he admitted her testimony without asking her to testify outside the presence of the jury or otherwise ruling on the issues raised in the motion hearing; he admitted her testimony as a statement of a party opponent. Her subsequent testimony was harmful to the defendant, but the relationship between the admission of her testimony and the defendant's absence from the February 1, 2013 hearing is attenuated. We will therefore confine our harmless error analysis to the other evidence discussed at the January 15, 2013 and February 1, 2013 hearings.

[16] The defendant's forensic expert raised the issue that a physician's diagnosis that L.B. had been strangled was not dispositive that she was strangled within the meaning of the legal standard. There were several common physical signs of strangulation that were not present during L.B.'s examinations or in the photographs taken by the police. On cross-examination, the expert conceded that there would be cases of strangulation where these physical

signs were not present.

---